IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN FIFE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 12 C 9647 |
| | ) | |
| MPHASE TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff John Fife has filed a motion pursuant to Federal Rule of Civil Procedure 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993) to exclude the testimony and opinions of Michael Parish, Defendant's expert on the federal securities fraud laws and the Depository Trust & Clearing Corporation. For the reasons discussed below, Plaintiff's motion is granted.

## BACKGROUND

On December 4, 2012, Fife filed a breach of contract Complaint against mPhase. (R. 1, Complaint.) In his Complaint, Fife alleges that pursuant to a Securities Purchase Agreement ("Securities Agreement") between St. George Investments, LLC ("St. George"), as buyer, and mPhase, as seller, St. George acquired a Convertible Note, issued by mPhase, in the principal amount of $557,000.00, dated September 13, 2011 (the "Note"). (*Id.* ¶ 6.) Fife further alleges that the Note is convertible into shares of mPhase's common stock that is publically traded on the Over The Counter Bulletin Board ("OTCBB"). (*Id.* ¶ 7.) On October 17, 2011, St. George and Fife entered into an Assignment of Convertible Note pursuant to which St. George assigned the Note, among other rights and agreements, to Fife, as the President of Fife Trading, Inc. (*Id.* ¶ 8.)

On May 31, 2012, Fife and mPhase entered into a Standstill and Restructuring Agreement (the "Standstill Agreement") pursuant to which Fife agreed not to convert any portion of the balance of the Note into shares of mPhase's common stock — provided that mPhase did not default on any provision of the Note or the Standstill Restructuring Agreement — in exchange for certain payments. (*Id.* ¶ 10.) The first payment from mPhase under the Standstill Agreement was due on October 1, 2012. (*Id.* ¶ 12.) Fife maintains that mPhase breached the Standstill Agreement because mPhase failed to make the October 2012 payment. (*Id.* ¶ 13.) Thereafter, on October 24, 2012, Fife contends that he delivered to mPhase a Conversion Notice whereby Fife elected to convert a portion of the Note's balance into

62,500,000 shares of mPhase's common stock (the "Conversion Shares"). (*Id.* ¶ 15.) Fife further alleges that mPhase did not deliver the Conversion Shares. (*Id.* ¶ 16.) Fife alleges that the balance of the Note as of November 16, 2012, including the redemption premium, is $902,279.60. (*Id.* ¶ 23.) Based on these allegations, Fife sues mPhase for: 1) breach of contract; 2) quasi contract, unjust enrichment and/or quantum meruit; and 3) specific performance.

In its Answer, mPhase denies Fife's allegations, asserts various affirmative defenses, and brings a breach of contract and fraud in the inducement and fraud counterclaim against Fife. (R. 16, Answer.) In one of its affirmative defenses, mPhase alleges that Fife entered into a Consent Decree with the Securities and Exchange Commission ("SEC") that Fife never disclosed to mPhase. (*Id.* ¶ 7.) It further alleges that Fife breached the duty of good faith and fair dealing "by intentionally engaging in a course of conduct designed to bring about" the Depository Trust & Clearing Corporation ("DTCC")'s "chill" of mPhase's stock. (*Id.* ¶ 9.) mPhase alleges that Fife's "Consent Decree and large conversions into mPhase common stock" caused the DTCC to "chill" mPhase's common stock in June of 2011. (*Id.* ¶ 18.) According to mPhase, a DTCC "chill" "requires any trades of a publicly held company's common stock to be settled by delivering certificates only and prohibits the use of continuous net settlement through electronic trading. A DTC[C] Chill results in a significant contraction in the market capitalization of the Company since it becomes very difficult for prospective individual investors to purchase and sell shares in the Company since most retail brokerage firms will not execute transactions in securities of a company" subject to such a chill." (*Id.*) mPhase alleges that Fife's conduct "effectively rendered mPhase's performance impossible." (*Id.* ¶ 20.)

mPhase has disclosed Michael Parish as its expert in federal securities laws and DTCC chills. Fife has moved to strike his opinions. The Court addresses each argument in turn.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)." *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 provides, in relevant part, that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact[,] . . . a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion. . . ." *Id. See also Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis,* 561 F.3d at 705.

Under the expert-testimony framework, courts perform the gatekeeping function of determining prior to admission whether the expert testimony is both relevant and reliable. *See id.*; *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). In doing so, courts "make the following inquiries before admitting expert testimony: First, the expert must be qualified as an expert by knowledge, skill, experience, training, or education; second, the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods;

2

and fourth, the expert must have reliably applied the principles and methods to the facts of the case." *Lees v. Carthage College*, 714 F.3d 516, 521-22 (7th Cir. 2013); *see also Pansier*, 576 F.3d at 737.

An expert may be qualified to render opinions based on experience alone. *See* 2000 Advisory Committee Notes to Rule 702. "In certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony." *Id.* The Seventh Circuit has repeatedly stated that "genuine expertise may be based on experience or training." *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002) (quoting *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir. 1996)). "[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trustees of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787-88 (7th Cir. 2007) (citations and quotations omitted). As such, courts "consider a proposed expert's full range of practical experience, as well as academic or technical training, when determining whether that expert is qualified to render an opinion in a given area." *Id.* (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)).

In assessing the admissibility of an expert's testimony, the Court's focus "must be solely on principles and methodology, not on the conclusions they generate.'" *Winters*, 498 F.3d at 742 (quoting *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek*, Inc., 689 F.3d 802, 805 (7th Cir. 2012).

## ANALYSIS

### I. Michael Parish

On March 3, 2014, mPhase disclosed Michael Parish as an expert witness in this case and provided Plaintiff with a copy of his expert report as required under Federal Rule of Civil Procedure 26(b)(2)(B). Fife seeks to exclude Mr. Parish's opinions at trial.

#### A. Qualifications

Michael Parish practiced law in New York for approximately 35 years at the law firms of LeBoeuf, Lamb, Leiby & MacRae (for 22 years), Winthrop, Stimson, Putnam & Roberts (for 5 years), Thelen, Reid & Priest (for 5 years), and Wolf, Block, Schorr & Solis-Cohen (for 3 years). (R. 95-1, CV.) Mr. Parish retired from the practice of law in 2003. While practicing law, Mr. Parish primarily did corporate work. He "did financial transactions, mergers and acquisitions and corporate counseling." (R. 107-1, Dep. at 10.) He researched and wrote one memorandum regarding Section 10b-5 securities fraud claims over twenty five years ago. (*Id.* at 20.) He does not have any litigation experience with securities fraud claims, including Section 10b-5 claims. (*Id.*)

Mr. Parish serves as the Chairman of the Board of Forum Funds, a group of mutual funds.  (*Id.* at 5.)  He has been involved with Forum Funds for approximately twenty-five years.  He also serves as a director and trustee of Forum Funds.  In his position at Forum Funds, Mr. Parish does not serve in an in-house counsel role.  Instead, he assists in setting the agenda, confers with servicers, including accountants and counsel, and runs the meetings.  (*Id.* at 8.)

**B.     Opinions**

Mr. Parish offered the following opinions in his expert report:

**Opinion #1:**    Plaintiff in purchasing the Convertible Note issued September 13, 2011 acquired a "Security' [sic] governed by the Securities Act of 1933, as amended, as the Securities and Exchange Act of 1934, as amended, including the Rules and Regulations thereunder.

**Opinion #2:**    Plaintiff's Consent Decree is a material item of information to Defendant in making an evaluation of whether to sell the Convertible Note to Plaintiff.

**Opinion #3:**    The Securities and Exchange Commission requires both a Purchaser and Seller of a Security to disclose material information to each other in connection with any transaction involving the purchase and sale of a security.

**Opinion #4:**    Defendant, as an issuer of a Security, is a "seller" in direct privity of contract with Plaintiff as "purchaser" for purposes of having a private right of action or affirmative defense under Rule 10b-5 to its obligations under the Operative Documents.

**Opinion #5:**    Defendant did not have "constructive notice" of the Consent Decree as a result of the SEC public records since the SEC imposes a continuing duty of disclosure upon Plaintiff with respect to material information, including the Consent Decree.  Further, depositions of Mr. Smiley indicate that Plaintiff attempted to satisfy this requirement, but was ineffective in doing so inasmuch as he referred Defendant to his website, which contained no mention of the Consent Decree.  Further, Plaintiff attempted to dissuade Defendant in doing business with another investor, alleging that this investor would bring lawsuits of precisely the type Plaintiff himself proceeded to bring after his deposits of large numbers of unregistered common stock which precipitated the DTCC Chill.

**Opinion #6:**    Plaintiff's Consent Decree was known to the DTCC and could, subject to further investigation, have been a significant factor or ingredient in causing the DTCC to impose a "chill" on Defendant's common stock.

**Opinion #7:**    The DTCC Chill of the Defendant's common stock negatively impacted the ability of Defendant to obtain continued financing since very few brokers and clearing firms will accept deposits of newly issued common stock while a DTCC Chill is in effect.

4

**Option #8:** The "chill" of Defendant's common stock by the DTCC increased Defendant's cost of financing through the sale of future Convertible Securities in Private Placements, thereby damaging Defendant.

**Opinion #9:** Subject to the caveat set forth in item 6 above, Defendant can establish, by the preponderance of the evidence a violation of Rule 10b-5 of the Securities Exchange Act of 1934, as amended.

**Opinion #10:** The Violation of Rule 10b-5 by Plaintiff renders the contract to purchase the Convertible Note issued September 11, 2013, "void" pursuant to Section 29(b) of the Securities Exchange Act of 1934, as amended.

**Opinion #11:** A second violation of Rule 10b-5 by Plaintiff would constitute a violation of Plaintiff's obligations under the Consent Decree.

**Opinion #12:** In April of 2012 Plaintiff sold common stock of Defendant under a Prospectus that failed to disclose Plaintiff's Consent Decree.

## II. Mr. Parish's Opinions Regarding the Securities Laws are Not Relevant to Any of the Claims in the Case and thus Will Not Assist the Trier of Fact

Plaintiff seeks to preclude Mr. Parish's Opinions 1-5 and 9-11 because they pertain to the federal securities laws and Rule 10b-5 violations, claims that are not part of this case. In response, Defendant argues that it has moved to amend its Counterclaims to add such claims. Because the Court denied Defendant's untimely motion to amend, the Court grants this aspect of Plaintiff's motion. (R. 114, Order Denying Motion to Amend.) These opinions regarding the federal securities laws are not relevant and will not assist the trier of fact in determining a relevant fact at issue in the case.

## III. Mr. Parish is Not Qualified to Give His Opinions Regarding the DTCC

Opinions 6, 7 and 8 pertain to the DTCC's decision to impose a "chill" on Defendant's common stock. Specifically, Mr. Parish opines as follows:

**Opinion #6:** Plaintiff's Consent Decree was known to the DTCC and could, subject to further investigation, have been a significant factor or ingredient in causing the DTCC to impose a "chill" on Defendant's common stock.

**Opinion #7:** The DTCC Chill of the Defendant's common stock negatively impacted the ability of Defendant to obtain continued financing since very few brokers and clearing firms will accept deposits of newly issued common stock while a DTCC Chill is in effect.

5

**Option #8:** The "chill" of Defendant's common stock by the DTCC increased Defendant's cost of financing through the sale of future Convertible Securities in Private Placements, thereby damaging Defendant.

Plaintiff contends that Mr. Parish is not qualified to render these opinions. The Court agrees. Mr. Parish lacks sufficient expertise regarding the DTCC and chills. Indeed, Mr. Parish conceded that he has never had any "direct interaction with DTC[C] of this sort." (R. 107-1 at 107). He also does not have any experience with the DTCC that would give him insight into why they decide to chill a particular stock. (*Id.* at 109.) In response to a question regarding what skills he had to render an opinion on what causes a DTCC chill, Mr. Parish testified that he "can read the DTC[C] letter." (*Id.* at 105.) Mr. Parish has not had any experience with the chilling of stock and he did not identify any legal work he did in connection with the DTCC. He also noted that his Opinion #6 was based on his review of the DTCC letter to mPhase and the deposition transcript of a witness from the DTC in this case. (*Id.* at 107.) Again, he did not identify any special skill or training that he used to reach that opinion. He simply read the document and testimony from this case and summarized it. In addition, the DTCC representative who testified in this case did not remember the details of the DTCC chill or exactly what caused it. (R. 95-3, DeSantis Dep. at 35, 55.) Furthermore, Mr. Parish reached Opinion #7 from "some reading on DTC[C] and the penny stocks market" and admitted that he did not employ a particular methodology to reach Opinions 7 or 8. (R. 107-1, Parish Dep. at 115, 118, 119.) Mr. Parish simply read Mr. Fife's deposition transcript in reaching Opinion #7 – he did not identify any special skill or experience he used to reach it. *See Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013) (an expert must have "a reliable basis in the knowledge and experience of [the relevant] discipline.") (citations and quotations omitted). As such, he cannot testify regarding these opinions.

## IV.  Many of Mr. Parish's Opinions are Improper Legal Conclusions

In addition, many of Mr. Parish's opinions are inadmissible legal conclusions. In the Seventh Circuit, "expert testimony that contains a legal conclusion that determines the outcome of a case is inadmissible." *RLJCS Enterprises, Inc. v. Prof'l Ben. Trust Multiple Emp'r Welfare Ben. Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007). "Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions." *Bausch & Lomb, Inc. v. Alcon Labs., Inc.*, 79 F.Supp.2d 252, 255 (W.D.N.Y. 2000) (quoting *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988)); *Se-Kure Controls, Inc. v. Diam USA, Inc.*, No. 06 C 4857, 2009 WL 77463, at *2 (N.D. Ill. Jan. 9, 2009) (concluding that proposed testimony of a patent expert on whether the patent at issue is enforceable, whether the patentee committed inequitable conduct, or the level of intent behind any alleged failures to disclose prior art was all inadmissible).

Plaintiff challenges several of Mr. Parish's opinions as impermissible legal conclusions. Defendant failed to respond to this argument. Plaintiff is correct that Mr. Parish's opinions regarding Rule 10b-5 violations are improper legal conclusions, and thus inadmissible. *See Roundy's Inc. v. N.L.R.B.,* 674 F.3d 638, 648 (7th Cir. 2012) (disallowing expert testimony amounting to legal argument); *United States v. Caputo,* 517 F.3d 935, 942 (7th Cir. 2008) (meaning of a statute is "a subject for the court, not for testimonial experts").

## V. Mr. Parish Cannot Give His State of Mind Opinions

Plaintiff also challenges Opinions 5 and 6 on the grounds that Mr. Parish inappropriately opines on the state of mind of the DTCC and mPhase in these opinions. Defendant fails to address this argument.

It is clear that an expert "must refrain from giving an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." *United States v. Pansier*, 576 F.3d 726, 738 (7th Cir. 2009) (citations and quotations omitted). *See also DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ("He could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive."); *Johnson v. Wyeth LLC*, No. 10-C-2690, 2012 WL 1204081, at *3 (D. Ariz. Apr. 11, 2012) (precluding plaintiff's experts from offering "opinions concerning defendants' motive, intent, knowledge, or other state of mind"); *George v. Kraft Foods Global, Inc.*, 800 F. Supp. 2d 928, 932-33 (N.D. Ill. 2011) (excluding expert's state of mind opinion as speculative and unhelpful).

Mr. Parish's Opinion ## 5 and 6 are improper opinions because they address mPhase's and the DTCC's state of mind. Opinion #5, for example, purports to opine on what mPhase did not know and what it would have done if it had known about the Consent Decree. Mr. Parish has no foundation to give such state of mind opinions.

## VI. Opinion #12 Is Not An Expert Opinion

In Opinion #12, Mr. Parish states: "In April of 2012 Plaintiff sold common stock of Defendant under a Prospectus that failed to disclose Plaintiff's Consent Decree." During his deposition, Mr. Parish conceded that this statement was a statement of fact and not an expert opinion. (R. 107-1 at 127.) Because Mr. Parish conceded that he does not have any first-hand knowledge of the facts in this case, he cannot testify to this fact.

## CONCLUSION

The Court grants Plaintiff's Motion to Exclude Testimony and Opinions of Michael Parish and to Strike Expert Report.

Date: June 4, 2014

AMY J. ST. EVE
United States District Court Judge