## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JOHN FIFE, an individual,<br><br>      Plaintiff,<br><br>v.<br><br>MPHASE TECHNOLOGIES, INC, a New Jersey corporation,<br><br>      Defendant. | Case No.: 1:12–CV–09647<br><br>Judge: Honorable Amy J. St. Eve<br><br>Magistrate: Daniel G. Martin |

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff John Fife ("*Fife*"), through undersigned counsel, and pursuant to L.R. 56.1(a)(3) of the Local Rules of the United States District Court for the Northern District of Illinois, submits the following statement of undisputed material facts that entitle Fife to judgment as a matter of law:

### *The Parties, Jurisdiction, and Venue*

1.      Fife is an individual, a citizen of Illinois, and resides in Cook County, Illinois. (Affidavit of John Fife, dated 07/14/13 ("*Fife Aff.*"), ¶ 1, attached hereto as Exhibit 1.)

2.      Defendant mPhase Technologies, Inc. ("*mPhase*") is a New Jersey corporation with its principal place of business in Norwalk, Connecticut.  (Answer ¶ 2, Docket No. 16.)

3. The amount in controversy in this case exceeds $75,000.00, exclusive of interest and costs. (Complaint ¶ 3, Docket No. 1)

4. mPhase consented and agreed to the jurisdiction and venue of this Court in a written agreement, which agreement states that mPhase "consents to the exclusive personal jurisdiction of the federal courts whose districts encompass any part of Cook County . . . in connection with any dispute arising under this Agreement, and hereby waives, to the maximum extent permitted by law, including any objection based on *forum non conveniens*, to the bringing of any such proceeding in such jurisdiction or to any claim that such venue of the suit, action or proceeding is improper." (Fife Aff. (Ex. 1) ¶ 2; Answer ¶ 6, Docket No. 16.)

### *The Securities Purchase Agreement and Convertible Note*

5. On September 13, 2012, St George (as buyer) and mPhase (as seller) entered into a Securities Purchase Agreement, whereby St George agreed to purchase a Convertible Note (the "***Note***") issued and signed by mPhase in the principal amount of up to $557,500.00. (Complaint ¶ 6; Answer ¶ 6; Fife Aff. (Ex. 1) ¶ 3.) A true and correct copy of the Securities Purchase Agreement and the Note are attached hereto as Exhibits 2 and 3, respectively. (Fife Aff. (Ex. 1) ¶ 3.[1])

6. In accordance with the terms of the Securities Purchase Agreement, St George paid $500,000.00 to mPhase in exchange for the Note. (Answer ¶ 32; Fife Aff. (Ex. 1) ¶ 3.) The

---

[1] Although the Fife Aff. originally authenticated those documents attached to the Statement of Undisputed Facts in Support of Plaintiff's Motion for Partial Summary Judgment (Doc. #28), the Fife Aff. is applicable to documents attached to the present document because—as demonstrated by the case stamps on the top of the documents—the documents attached to this Statement of Undisputed Facts and authenticated by the Fife Aff. are the same as those attached to the original Statement of Undisputed Facts.

$500,000.00 purchase price reflected a original issue discount of $50,000.00 and an additional $7,500.00 dollar reduction in the purchase price "to cover the Buyer's legal fees, accounting costs, due diligence, monitoring and other transaction costs incurred in connection with the purchase and sale of [securities associated with the Note]." (Securities Purchase Agreement (Ex. 2) § 2.c.)

7. In signing the Securities Purchase Agreement, mPhase specifically acknowledged that both it (and its stockholders, officers, agents, and representatives) had been "advised to seek legal counsel and to review the [Securities Purchase] Agreement and all of the other Transaction Documents with legal counsel of his/her/its choice, and . . . either has sought such legal counsel or hereby waives the right to do so." (*Id.* § 15.m.)

8. In addition, mPhase agreed that if an action was brought "to enforce or interpret the terms of th[e Security Purchase Agreement] or any of the other Transaction Documents, the Prevailing Party . . . shall be entitled to reasonable attorneys' fees, court costs and collection costs . . . ." (*Id.* § 15.o.)

9. Turning to the Note, mPhase agreed, inter alia, to the following relevant terms:

1. PAYMENTS OF PRINCIPAL; PREPAYMENT. On each Installment Date (which includes the Maturity Date), the Company [mPhase] shall pay to the Holder [Fife] an amount equal to the Installment Amount due on such Installment Date in accordance with Section 8. . . . "**Outstanding Balance**" means the sum of the Principal, any accrued but unpaid Interest, collection and enforcement costs, and any other fees or penalties incurred under this Note or under the Purchase Agreement.
. . .

2. <u>INTEREST; INTEREST RATE</u>. . . . Interest on the Outstanding Balance of this Note shall accrue at the rate of eight percent (8%) per annum, provided that upon the occurrence and during the continuance of an Event of Default, Interest shall accrue on the Outstanding Balance at the rate of eighteen percent (18%) per annum. All interest calculations hereunder shall be computed on the basis of a 360-day year comprised of twelve (12) thirty (30) day months, shall compound daily and shall be payable in accordance with the terms of Note.

3. <u>CONVERSION OF NOTE</u>. This Note shall be convertible into validly issued, fully paid and non-assessable shares of Common Stock, on the terms and conditions set forth in this Section 3.

        (a)    <u>Conversion Right</u>.

(i) . . . at any time or times on or after the Issuance Date, the Holder shall be entitled to convert any portion of the outstanding and unpaid Conversion Amount (as defined below) into validly issued, fully paid and non-assessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below).
. . .

        (b)    <u>Conversion Rate</u>. The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 3(a)(i) shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the "**Conversion Rate**").

(i) "**Conversion Amount**" means the portion of the Outstanding Balance to be converted, redeemed or otherwise with respect to which this determination is being made.

(ii) "**Conversion Price**" means, as of any Conversion Date or other date of determination, $0.01, subject to adjustment as provided herein.

        (c) <u>Mechanics of Conversion</u>.

(i) <u>Conversion Prior to Maturity Date</u>. To convert any Conversion Amount into shares of Common Stock on any date (a "**Conversion Date**"), the Holder shall deliver (whether via email, facsimile or

otherwise), for receipt on or prior to 11:59 p.m., New York time, on such date, a copy of an executed notice of conversion in the form attached hereto as <u>Exhibit A</u> (the "**Conversion Notice**") to the Company.

. . .

4.      <u>RIGHTS UPON EVENT OF DEFAULT</u>.
        . . .

(a) Event of Default.  Each of the following events shall constitute an "**Event of Default**": . . .

(ii) the Company's (A) failure to cure a Conversion Failure by delivery of the required number of shares of Common Stock within three (3) Trading Days after the Company's receipt of a Conversion Notice or (B) notice, written or oral, to any holder of this Note, including, without limitation, by way of public announcement or through any of its agents, at any time, of its intention not to comply, as required, with a request for conversion of this Note into shares of Common Stock that is requested in accordance with the provisions of this Note, other than pursuant to Section 3(d) . . . .

(iv) the Company's failure to pay to the Holder any amount of Principal, Interest, Late Charges or other amounts when and as due (including, without limitation, a failure to deliver Post-Installment Conversion Shares or Pre-Installment Conversion Shares) under this Note . . . .

(xvi) the failure of the Company or its Transfer Agent within six (6) months of the date of this Note to become DTC and Deposit Withdrawal at Custodian ("**DWAC**") eligible and ay any time thereafter.

(b)  <u>Notice of an Event of Default; Redemption Right</u>. . . . At any time after the earlier of the Holder's receipt of an Event of Default Notice and the Holder becoming aware of an Event of Default, the Holder may require the Company to redeem (regardless of whether such Event of Default has been cured) all or any portion of this Note by delivering written notice thereof (the "**Event of Default Redemption Notice**") to the Company, which

Event of Default Redemption Notice shall indicate the portion of this Note the Holder is electing to redeem.

. . .

8.    <u>COMPANY INSTALLMENT CONVERSION OR REDEMPTION</u>. Beginning on the earlier of (i) the date that is thirty (30) days following the date of an effective Registration Statement filed by the Company, and (ii) November 30, 2011 (the "**Initial Installment Date**"), and on each applicable Installment Date thereafter, the Company shall pay to the Holder of this Note the applicable Installment Amount due on such date by converting such Installment Amount in accordance with this Section 8 (a "**Company Conversion**"); provided, however, the Company may, at its option as described below, pay all or any part of such Installment Amount by redeeming such Installment Amount in cash (a "**Company Redemption**") or by any combination of a Company Conversion and a Company Redemption so long as the entire amount of such Installment Amount due shall be converted and/or redeemed by the Company on the applicable Installment Date, subject to the provisions of this Section 8

. . .

(a)  Pre-Installment Notice: Delivery of Pre-Installment Shares. On or prior to the date which is the twenty-third (23rd) Trading Day prior to each Installment Date (each, an "**Installment Notice Due Date**"), the Company shall deliver written notice (each, a "**Company Installment Notice**" and the date the Holder receives such notice is referred to as to the "**Company Installment Notice Date**"), to the Holder . . . If the Company does not timely deliver a Company Installment Notice in accordance with this Section 8 with respect to a particular Installment Date, then the Company shall be deemed to have delivered on the Installment Notice Due Date an irrevocable Company Installment Notice confirming a Company Conversion of the entire Installment Amount payable on such Installment Date and shall be deemed to have certified that there is not an Equity Conditions Failure on the applicable Installment Notice Due Date and the applicable Installment Date. No later than two (2) Trading Days after delivery or deemed delivery (as applicable) of the applicable Company Installment Notice setting forth a Company Conversion Amount, the Company shall deliver to the Holder's account via DTC the Pre-Installment Conversion Shares.

. . .

6

29. <u>CERTAIN DEFINITIONS</u>. For purposes of this Note, the following terms shall have the following meanings:

. . .

(v) "**Installment Amount**" means (i) $57,500, plus, (ii) the sum of any accrued and unpaid Interest as of the applicable Installment Date under this Note and accrued and unpaid Late Charges, if any, under this Note as of such Installment Date, and any other amounts accruing or owing to Holder under this Note as of such Installment Date.

. . .

(w) "**Installment Date**" means the Initial Installment Date and the last day of each of the next nine (9) months following the month during which the Initial Installment Date occurs.

. . .

(y) "**Maturity Date**" shall mean August 31, 2012;

. . .

(gg) "**Pre-Installment Conversion Shares**" means the number of shares of Common Stock to be delivered pursuant to section 8(a) on the date of the applicable Company Installment Notice. The Pre-Installment Conversion Shares are equal to the quotient of (i) the applicable Company Conversion Amount divided by (ii) the Company Conversion Price as of the applicable date of the Company Installment Notice.

. . .

(Note (Ex. 3) §§ 1, 3-4, 8, 29; Fife Aff. (Ex. 1) ¶ 4.)

10. In addition, and as with the Securities Purchase Agreement, mPhase specifically agreed that it would pay those attorneys fees and costs associated with any action to enforce or collect the amounts due under the Note. (Note (Ex. 3) § 19.)

11. On October 17, 2011, St George assigned the Note and its rights thereunder to Fife, pursuant to an Assignment of Convertible Note (the "***Assignment***"). (Fife Aff. (Ex. 1) ¶ 5; Answer ¶ 8.) A true and correct copy of the Assignment of Convertible Note is attached hereto as Exhibit 4. (Fife Aff. (Ex. 1) ¶ 5.)

12. mPhase specifically agreed to and approved the Assignment. (Fife Aff. (Ex. 1) ¶ 6; Assignment (Ex. 4), at 3; Answer ¶ 9.)

### *mPhase breaches the Note*

13. Under the Note, mPhase was required to deliver a Company Installment Notice on October 27, 2011 (23 trading days prior to the Initial Installment Date). (Note (Ex. 3) § 8(a).)

14. mPhase failed to deliver this notice and, as a result and pursuant to Section 8(a) of the Note, mPhase "was deemed to have delivered on [October 27, 2011] an irrevocable Company Installment Notice." (Affidavit of Christina Saxton, dated 06/25/14 ("***Saxton Aff.***"), ¶ 8-10, attached hereto as Exhibit 5; Note (Ex. 3) § 8(a).)

15. Following the deemed delivery of mPhase's Company Installment Notice on October 27, 2011, section 8(a) of the Note required that mPhase deliver to St George and/or Fife the Pre-Installment Conversion Shares no later than October 31, 2011 (two Trading Days after October 27, 2011). (Saxton Aff. (Ex. 5), ¶ 11; Note (Ex. 3) § 8(a).)

16. mPhase failed to deliver the Pre-Installment Conversion Shares on October 31, 2011, or at anytime thereafter. (Saxton Aff. (Ex. 5), ¶ 12.)

### *mPhase and Fife enter into a Standstill and Restructuring Agreement*

17. Following mPhase's breach of the Note, on May 31, 2012, mPhase and Fife entered into a Standstill and Restructuring Agreement (the "***Standstill Agreement***"). (Fife Aff. (Ex. 1) ¶ 7; Answer ¶ 10.) A true and correct copy of the Standstill Agreement is attached hereto as Exhibit 6. (Fife Aff. (Ex. 1) ¶ 7.)

18. Under the terms of the Standstill Agreement, Fife agreed not to convert any portion of the Outstanding Balance of the Note into common stock for a specific period of time. (Standstill Agreement (Ex. 6) § 2.)

19. In exchange, mPhase increased the Outstanding Balance of the Note by $57,612.52 (the "**Standstill Fee**") and promised to begin making monthly payments to Fife beginning on October 1, 2012. (*Id.* §§ 3-4.)

20. If mPhase failed to perform under the Standstill Agreement, mPhase acknowledged and agreed that "the Standstill shall terminate immediately . . . and that upon such breach of any material term or provision in this Agreement, Lender may seek all recourse and remedies available to it under the terms of the Note, the other Loan documents, or applicable law." (*Id.* § 6; *see also id.* § 2.)

21. In executing the Standstill Agreement, mPhase also agreed that the Note remained in full force and effect, that mPhase "is unconditionally obligated to pay the Outstanding Balance of the Note pursuant to its terms," and that—at the time the Standstill Agreement was executed—the Outstanding Balance due under the Note, including the Standstill Fee, was $777,769.08. (*Id.* § 7; *see also id.* § 17.)

22. mPhase also waived its

> defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against [Fife], directly or indirectly, arising out of, based upon, or in any manner connected with, the transactions contemplated hereby, whether known or unknown, which occurred, existed, was taken, permitted, or begun prior to the execution of th[e Standstill Agreement] and occurred, existed,

> was taken, permitted or begun in accordance with, pursuant to, or
> by virtue of any of the terms or conditions of the Loan
> Documents[,]

and mPhase specifically waived its right to "any defenses, rights of offset, or counterclaims"

with regard to the Note.  (*Id.* §§ 7, 8(e).)

       23.     mPhase further specifically represented that (1) Fife did not waive any prior

breaches of the Note by entering into the Standstill Agreement and (2) mPhase entered the

agreement only after having an adequate opportunity to consult with legal counsel of its choice

and mPhase

> has actively and with full understanding participated in the
> negotiation of th[e Standstill] Agreement and all other documents
> executed and delivered in connection with th[e Standstill]
> Agreement after consultation and review with its counsel (or had
> the opportunity to be represented by counsel), that all of the terms
> and conditions of th[e Standstill] Agreement and other documents
> executed and delivered in connection with th[e Standstill]
> Agreement have been negotiated at arm's-length, and that this
> Agreement and all such other documents have been negotiated,
> prepared, and executed without fraud, duress, undue influence, or
> coercion of any kind or nature whatsoever having been exerted by
> or imposed upon any party by any other party.

(*Id.* §§ 8(d), (f).)

       24.     Finally, as with the Securities Purchase Agreement and the Note, the Standstill

Agreement states that the prevailing party is entitled to those attorneys' fees and costs associated

with any litigation or dispute arising out of the agreement.  (*Id.* § 12.)

### *mPhase breaches the Standstill Agreement*

25.      Since entering into the Standstill Agreement, mPhase has not made any payments to Fife.  (Fife Aff. (Ex. 1) ¶ 9; Saxton Aff. (Ex. 5) ¶ 17; Defendant's Response to Plaintiff's Requests for Admission ("***Resp. Req. Adm.***") No. 1, attached hereto as Exhibit 7; mPhase 30(b)(6) Deposition (the "***mPhase Depo.***"), at 33:23-35:8, attached hereto as Exhibit 8.)

26.      On October 24, 2012, following mPhase's failure to make its first payment due under the Standstill Agreement, Fife delivered to mPhase a Conversion Notice whereby Fife elected to convert a portion of the Note's balance into 62,500,000 shares of mPhase's common stock (the "***Conversion Shares***").  (Fife Aff. (Ex. 1) ¶ 10.)  A true and correct copy of the Conversion Notice is attached hereto as Exhibit 9.  (*Id.* ¶ 10.)

27.      To date, mPhase has not delivered the Conversion Shares to Fife.  (Fife Aff. (Ex. 1) ¶ 11; Saxton Aff. (Ex. 5) ¶ 17; Resp. Req. Adm. (Ex. 7) No. 2; mPhase Depo. (Ex. 8), at 57:15-17.)

28.      On November 16, 2012, based on mPhase failure to make payments or honor the Conversion Notice and pursuant to the Standstill Agreement and the Note, Fife sent an event of default redemption notice (the "***Redemption Notice***") to mPhase electing to redeem the full Outstanding Balance and demanding immediate payment by November 23, 2012.  (Fife Aff. (Ex. 1) ¶ 12.)  A true and correct copy of the Redemption Notice is attached hereto as Exhibit 10.  (*Id.* ¶ 10.)

29.     mPhase did not comply with the Redemption Notice, and, as stated above, has made no payments to mPhase since it entered into the Standstill Agreement.  (Fife Aff. (Ex. 1) ¶ 13; Resp. Req. Adm. (Ex. 7) No. 1; mPhase Depo. (Ex. 8), at 57:15-58:16.)

### Fife's Damages

30.     On September 13, 2011, Fife's predecessor, St George, funded the first Tranche of the Note in the amount of $357,500.00, including an original issue discount and transaction expenses.  (Saxton Aff. (Ex. 5) ¶ 5; Answer ¶ 32.)

31.     On October 14, 2011, Fife's predecessor, St George, funded the Second Tranche of the Note in the amount of $200,000.00.  (Saxton Aff. (Ex. 5) ¶ 6; Answer ¶ 32.)

32.     The initial interest rate, compounding daily, was 8% per annum.  (Saxton Aff. (Ex. 5) ¶ 7; Note (Ex. 3) § 2.)

33.     On October 31, 2011, due to mPhase's failure to make timely payment or provide the required shares, the default interest rate of 18% per annum was triggered.  (Saxton Aff. (Ex. 5) ¶ 13; Note (Ex. 3) § 2.)

34.     On May 31, 2012, the Standstill Fee ($57,600.52) was added to the balance of the Note, bringing the total Outstanding Balance to $777,769.08 (as set forth in section 7 of the Standstill Agreement).  (Saxton Aff. (Ex. 5) ¶ 19; Standstill Agreement (Ex. 6) § 7.)  The addition of the Standstill Fee is reflected on the summary of damages spreadsheet ("***Damages Spreadsheet***") attached hereto as Exhibit 11.  (Saxton Aff. (Ex. 5) ¶ 18.)

35.     Due to mPhase's failure to perform under the Standstill Agreement, the Outstanding Balance reflected in the Damages Spreadsheet has born interest at the default

interest rate of 18% per annum since May 31, 2012.  (Saxton Aff. (Ex. 5) ¶ 19; Damages

Spreadsheet (Ex. 11); Standstill Agreement (Ex. 6) § 6.)

36.     As of June 26, 2014, the total amount owed Fife, including principal, interest, and

the Standstill Fee is $1,134,940.15.  (Saxton Aff. (Ex. 5) ¶ 20; Damages Spreadsheet (Ex. 11).)

37.     In addition, to those damages listed above, as of May 19, 2014, Fife had paid

$205,655.93 in attorneys' fees and costs in pursuing the above-captioned lawsuit against

mPhase.  (Saxton Aff. (Ex. 5) ¶ 21.)

### *Undisputed facts relevant to mPhase's counterclaims*

In addition to those facts set forth above, the following facts are material as to mPhase's

counterclaims against Fife.

38.     In June 2011, the Depository Trust and Clearing Corporation (the "***DTCC***")

imposed a chill on mPhase's common stock.  (mPhase Depo. (Ex. 8), at 102:11-13.)

39.     In July 2012, over one year after mPhase's stock was chilled, its attorney wrote a

letter to the DTCC requesting that the DTCC explain the basis for the chill.  (*Id.*, at 104:2-21.)

40.     In response to mPhase's inquiry, the DTCC responded with a letter dated

September 17, 2012 (the "***DTCC Chill Letter***"), explaining that the chill had been imposed due

to

> unusually large deposits of the Issue during the period of August
> 18, 2010 to the date of the Deposit Chill.  More particularly,
> 414,385,628 shares of the Issue, representing a substantial
> percentage of the outstanding float, where deposited at the DTC
> during this period. (A list of the deposits is attached hereto as
> Exhibit A.)  The volume and timing of the deposits raise
> substantial questions as to whether those shares are tradeable

> without restriction under the Securities Act of 1933, as amended . . ., a prerequisite for shares being deposited into the DTC for depository and book-entry services.

(DTCC Chill Letter, at 1.)  A true and correct copy of the DTCC Chill Letter is attached hereto as Exhibit 12.  (mPhase Depo. (Ex. 8), at 116:11-117:19.)

     41.     The list of deposits referred to in and attached to the DTCC Chill Letter as Exhibit A (the "***Deposits***") included some deposits made by John Fife.  (DTCC Chill Letter (Ex. 12), at Ex. A.)

     42.     In a letter to the DTCC, dated October 23, 2012, mPhase explained, through its outside counsel, that the Deposits and shares associated with them were "duly authorized, validly issued and fully paid and are nonassessable" and were otherwise proper transactions in compliance with applicable laws.  (Letter from Brian A. Lebtecht to DTCC, dated October 23, 2012.)  A true and correct copy of the letter from Brian A. Lebtecht to the DTCC is attached hereto as Exhibit 13. (mPhase Depo. (Ex. 8), at 117:23-11:24.)

     43.     Additionally, in a second letter dated the same day—October 23, 2013, mPhase represented to the DTCC, through its in-house counsel Martin Smiley, echoing the opinion its outside counsel and stating the Deposits were proper transactions in compliance with applicable laws.  (Letter from Martin B. Smiley to DTCC, dated October 23, 2012.)  A true and correct copy of the Letter from Martin B. Smiley to the DTCC is attached hereto as Exhibit 14.  (mPhase Depo. (Ex. 8), at 121:21-122:15.)

     44.     In a letter dated September 12, 2013, mPhase, through its outside counsel, again reiterated its earlier statements that the Deposits and shares associated with them were "were, at

the date of deposit at the DTC, eligible under the Rules and Procedures of DTC to be deposited for the Services." (Letter from Owen Naccarato to DTCC, dated September 12, 2013). A true and correct copy of the Letter from Owen Naccarato to the DTCC is attached hereto as Exhibit 15. (mPhase Depo. (Ex. 8), at 126:11-21.)

45.     On or around September 16, 2013, the DTCC sent a letter to mPhase stating that the DTCC "has determined to lift the Deposit Chill and has resumed accepting deposits of [mPhase's common stock] for depository and book-entry transfer services." (Letter from Donald Maj to Scott E. Linsky, dated September 16, 2013.) A true and correct copy of the Letter from Donald Maj to Scott E. Linsky is attached hereto as Exhibit 16. (mPhase Depo. (Ex. 8), at 22:4-23.)

46.     In her deposition testimony, Susan DeSantis (the DTCC representative for purposes of this lawsuit) stated that a number of factors may trigger a deposit chill, (Deposition of Susan DeSantis (the "***DTCC Depo.***"), at 29:16-30:12, attached hereto as Exhibit 17), and that she did not know or remember if Fife's consent decree played any role whatsoever in the imposition of the chill. (*Id.*, at 35:3-16, 44:16-22, 49:13-24, 55:13-17, 60:23-61:8, 65:23-66:7.)

47.      Ms. DeSantis also testified that the DTCC chill was lifted because mPhase demonstrated that the Deposits in question were proper transactions in compliance with applicable laws. (*Id.*, at 79:2-16.)

48.     Throughout the duration of the DTCC chill, the DTCC never requested that mPhase provide (and mPhase never did provide) information related to Fife's consent decree. (*See generally* DTC0001-DTC0601.)

***Lack of evidence supporting mPhase's breach of contract claim***

49.     In its deposition, mPhase was asked about its allegations that Fife breached

section 5(a)(i) of the Securities Purchase Agreement by engaging in naked short sales, and

mPhase (through its corporate representative) offered the following with regard to the evidence

supporting that claim:

> . . . .
> Q.      Do you have any evidence that Mr. Fife sold—well,
> conducted a naked short sell of mPhase stock?
> A.      Not directly, but as I said, because of the manipulative
> activities that he engaged in and the consent decree, it opens
> questions that this may well have occurred because it is a typical
> hedging technique of convertible debenture holders that lend to
> microcap companies.
> . . . .

(mPhase Depo. (Ex. 8), at 67:6-15.)

Respectfully submitted,

JOHN FIFE

  /s/ Brigman L. Harman
Brigman L. Harman, one of his Attorneys

| | |
|---|---|
| Jeremy C. Reutzel (pro hac vice) | Scott L. Warner (06231380) |
| Brigman L. Harman (pro hac vice) | Ellen F. Wetmore (06304273) |
| Bennett Tueller Johnson & Deere | Franczek Radelet P.C. |
| 3165 East Millrock Drive, Suite 500 | 300 S. Wacker Dr., Suite 3400 |
| Salt Lake City, Utah 84121-5027 | Chicago, Illinois 60606 |
| Telephone: (801) 438-2000 | Telephone: (312) 986-0300 |
| Email: jreutzel@btjd.com | Email: slw@franczek.com |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that he served the foregoing on the following attorneys of record via the Court's CM/ECF system on this 26th day of June, 2014:

| | |
|---|---|
| Richard Roth | Darrell J. Graham |
| The Roth Law Firm PLLC | Roser Bucheit & Graham |
| 295 Madison Avenue, Floor 22 | Two Riverside Plaza, Suite 1420 |
| New York, NY 10017 | Chicago, IL 60606 |
| Rich@rrothlaw.com | dgraham@rbglegal.com |

By: _____/s/Brigman L. Harman_____