**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN FIFE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  12-cv-9647 |
| | ) | |
| MPHASE TECHNOLOGIES, INC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Plaintiff, John Fife ("Fife" or "Plaintiff") has moved for summary judgment pursuant to

Federal Rule of Civil Procedure 56 on his breach of contract claim.  For the following reasons,

the Court grants Plaintiff's motion.

Fife filed a complaint against Defendant, mPhase Technologies, Inc. ("mPhase" or

"Defendant"), related to a Convertible Note (the "Note") issued by mPhase to St. George

Investments LLC ("St George") in the principal amount of $557,000.00.  (R.1, Complt, ¶¶ 6-7.)

St George subsequently assigned the Note to Fife.  (*Id.*, ¶¶ 8-9.)   Fife, a citizen of Illinois,

alleges that after the assignment of the Note, he entered into a Standstill and Restructuring

Agreement (the "Standstill Agreement") with mPhase whereby he "agreed to not convert any

portion of the balance of the Note into shares of mPhase's common stock … in exchange for

certain payments."  (*Id.*, ¶ 10.)  Fife further alleges that mPhase did not make the first payment as

required by the Standstill Agreement, which resulted in termination of the Standstill Agreement.

(*Id.*, ¶¶ 11-13.)  As alleged, Fife retained his rights and remedies under the Note and

subsequently delivered a Conversion Notice to mPhase to convert a portion of the Note's balance into shares of mPhase's common stock. (*Id.*, ¶¶ 14, 15.) Fife asserts that mPhase defaulted on its obligations and failed to convert and deliver the shares which provided Fife the right to submit a Redemption Notice to redeem the entire balance of the Note. (*Id.*, ¶¶ 16, 21.) Fife's complaint alleges breach of contract (Count I), or alternatively, quasi contract, unjust enrichment, and/or quantum meriut (Count II),[1] and specific performance (Count III). (*Id.*)

Relevant to this summary judgment motion, mPhase asserts affirmative defenses and counterclaims of breach of contract and fraud. (*See* R.16, Answer.) mPhase asserts that Fife's failure to disclose a Consent Decree from 2007 relating to a prior litigation with the Securities and Exchange Commission ("SEC") allegedly caused the Depository Trust Company ("DTC") to impose a chill on mPhase's stock and made it impossible for mPhase to convert the Note's balance to shares. (R.16, ¶ 12.) Fife moves for summary judgment as to his breach of contract claim and mPhase's counterclaims of breach of contract and fraud. The crux of the dispute between the parties revolves around the reasons for mPhase's non-performance under the contract.

## BACKGROUND

### I.    Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot

---

[1] Because the Court finds a binding and enforceable contract exists in granting Fife's motion for summary judgment on its breach of contract claim (Count I), Fife's quasi contract, unjust enrichment, and/or quantum meriut claim (Count II) pled in the alternative is hereby dismissed without prejudice. *See Barry Mogul & Assoc., Inc. v. Terrestris Dev. Co.*, 643 N.E.2d 245, 251 (Ill. App. Ct. 1994) ("[A] plaintiff may not pursue a quasi-contractual claim where there is an enforceable, express contract between the parties"); *cf. Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003) (recognizing the doctrine of pleading in the alternative that the court finds no contract was formed, allows a quasi-contractual relief to be pled in the alternative to a breach of contract).

afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994)).  Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009) (quoting L.R. 56.1(a)(3)).  The nonmoving party must file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (quoting L.R. 56.1(b)(3)(B)).  The nonmoving party also may submit a separate statement of additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon to support those facts. *See* L.R. 56.1 (b)(3)(C); *see also Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008).

The purpose of Rule 56.1 statements is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (finding Rule 56.1 statements incompliant when they fail to adequately cite the record and are filled with irrelevant information, legal arguments, and conjecture.")  The Court may disregard statements and responses that do not properly cite to the record. *See Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809-810) (7th Cir. 2005.) Moreover, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000).  "[D]istrict courts are entitled to

expect strict compliance with Local Rule 56.1." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006).

Fife argues that many of mPhase's responses to Fife's Rule 56.1 Statement of Facts are insufficient to establish genuine issues of material facts as they are not compliant with the Local Rules and do not constitute admissible evidence. Many of mPhase's responses either do not reference any affidavits, parts of the record, or other supporting materials as required by Local Rule 56.1(b)(3)(B) or reference materials that do not support the factual allegation (*see e.g.,* R.132, ¶¶ 9, 11, 16, 21, 41). *See Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 871 (7th Cir.2000) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission."); *See Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) (ruling that the district court acted within its discretion when it deemed defendant's statement of facts admitted because the plaintiff failed to support controverted or additional facts with citations to admitted evidence); In addition, mPhase provides legal arguments that do not suffice to establish genuine issues of material dispute (*see e.g.*, R.132, ¶¶ 3, 16, 20-29). *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006) (explaining that it is inappropriate to make legal arguments in Rule 56.1 statements and responses).

mPhase also attempts to dispute facts with evasive allegations that either misstate the evidence relied on or do not directly address the issue asserted (*see e.g.*, R.132, ¶¶ 13-15). *See Nat'l Inspection & Repairs v. George S. May Int'l Co.,* No. 03–CV–5529, 2008 WL 4389834, at *2 (N.D. Ill. Sept. 24, 2008) ("The court agrees that certain of [the plaintiffs'] responses or additional facts improperly state legal conclusions, assert facts not supported by the record, or misstate the evidence"). mPhase further provides attorney argument related to additional facts,

however, the Local Rules provide that such facts are to be asserted in a Statement of Additional Facts (*see e.g.*, R.132, ¶¶ 5, 10-12, 21-24, 26-29). *See* L.R. 56.1(b)(3)(C); *see also Ammons v. Aramark Unif. Servs., Inc.,* 368 F.3d 809, 817 (7th Cir. 2004) (ruling that the non-moving party should place additional facts in a separate statement, not in his responses to a moving party's statement); *Schwab v. N. Ill. Med. Ctr.*, ___F.Supp.2d ___, 2014 WL 2111124, at *1 (N.D. Ill. May 20, 2014) (disregarding the plaintiff's Local Rule 56.1 (b)(3)(B) response to the extent it included "facts that go beyond what is fairly responsive to the corresponding paragraphs of [the defendant's] Local Rule 56.1(a)(3) statement"); *Malec v. Sanford,* 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("Rule 56.1(b)(3)(B) 'provides the only acceptable means of ... presenting additional facts.' " (quoting *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995))).  As such, paragraphs 3, 5, 6, 9-16, 20-29, and 41 of Fife's Rule 56.1 Statement of Facts are deemed admitted.

Furthermore, Fife takes issue with mPhase's Statement of Additional Facts and the underlying Smiley Affidavit.  Fife argues that mPhase's Statement of Additional Facts constitutes improper expert opinion testimony or lack the appropriate foundation for the factual assertions made.  mPhase's Statement of Additional Facts is problematic in at least two respects: (1) it relies on improper expert testimony and (2) its factual assertions are contradicted by the pleadings and affiant's prior deposition testimony in this case.  First, mPhase asserts facts relating to Fife's obligations to disclose his Consent Decree, specifically relying on spreadsheets to establish shareholder ownership to prove Fife is a "control person."  These spreadsheets are inadmissible evidence as there is a lack of foundation for the data relied upon and there is no basis provided for where the numbers were obtained, how the calculations were completed, and who conducted the computations (*see e.g.,* R.131, ¶¶ 26, 27, 28, 30, 36; R.131-2, Ex. L; R.131-3,

Ex. P.)  *See Curry v. City of Chicago*, No. 10 CV 8241, 2013 WL 1283477, at *8 (N.D. Ill. Mar. 25, 2013) (striking supplemental exhibits for failure to comply with Local Rule 56.1, lack of foundation, and hearsay); *see also Smith v. Allstate Ins. Corp.*, No. 99 C 0906, 2002 WL 485374, at *4 (N.D. Ill. Mar. 29, 2002) (striking portions of plaintiff's affidavit that provide no foundation for her statements).  Evidence must be admissible in order for the Court to consider it when determining summary judgment and improper opinion testimony or testimony that does not refer to supporting evidence or provide a foundation for personal knowledge of the facts asserted is improper and should not be relied on by the Court.  *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) (citing *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000) ("The evidence supporting a factual assertion must represent admissible evidence")).

mPhase also relies on the affidavit of Martin Smiley, mPhase's General Counsel and Chief Financial Officer, to provide legal opinions and opinions related to public trading of securities generally and to the details surrounding this dispute specifically.  (*See e.g.*, R.131-1, Ex. A, Smiley Aff., ¶¶ 5, 10, 25, 35, 37, 38; R.132-1, Ex. A, Smiley Aff., ¶¶ 5, 10, 25, 35, 37, 38).[2]  Mr. Smiley, however, has not been disclosed as a legal expert, nor has he been disclosed as a securities expert.  Additionally, some of the factual assertions of the Smiley Affidavits contradict other factual assertions, mPhase's pleadings, and Mr. Smiley's prior deposition testimony.  The Smiley Affidavits, for example, assert that "[i]n early October 2012, mPhase was advised by outside counsel that it would be impossible for the DTC to remove the chill if mPhase permitted any stock conversions and/or sales to the public by any person who name appeared in

---

[2] mPhase submitted the Smiley Affidavit in support of its Responses to Fife's Rule 56.1 Statement of Facts (R.132) and mPhase submitted the identical affidavit in support of its Rule 56.1 Statement of Additional Facts (R.131).

the DTC Letter."  (R.131-1, ¶ 31; R.132-1, ¶ 31.)  In its Answer, however, mPhase asserted that "[i]n early October 2012, mPhase was advised in a telephone discussion with the DTC that any large conversions by its large convertible securities holders prior to the removal of the DTC chill would make it almost impossible for DTC to ever remove the DTC Chill."  (R.16, ¶ 35.)

Mr. Smiley also asserts that "[a]fter Fife filed this lawsuit, mPhase first learned in discovery about Fife's Consent Decree that he had concealed from mPhase for the four years of their relationship."  (R.131-1, ¶ 37; R.132-1, ¶ 37.)  A copy of Fife's Consent Decree, however, is attached as an exhibit to mPhase's Answer, filed on February 27, 2013, the same day the parties proposed a discovery schedule to the Court.  (*See* R.16-1; R.17.)  Furthermore, Mr. Smiley previously testified, on behalf of mPhase, that he learned of Fife's Consent Decree in a telephone conversation with the DTC held prior to October 24, 2012.  (*See* R.119-8, Smiley Deposition, 5:12-6:7; *id.*, 49:1-51:21.)  The contradictory assertions in paragraphs 31 and 37 of the Smiley Affidavits are therefore stricken.  *See Bordelon v. Chicago Sch. Reform Bd. of Trustees, 233 F.3d 524, 527* (7th Cir. 2000) (upholding district court's decision to entirely strike the non-moving party's statement where it "contained evasive and contradictory answers and legal arguments"); *see also Long v. Teachers' Retirements Sys. of State of Ill.*, 566 F.Supp.2d 851, 855-56 (C.D. Ill. 2008), *aff'd,* 585 F.3d 344 (7th Cir. 2009) (striking paragraphs in a witness's affidavit that were inconsistent with her prior deposition testimony).

For the reasons explained above, the Court strikes paragraphs 26, 27, 28, 30, and 36 of mPhase's Rule 56.1 Statement of Additional Facts and strikes paragraphs 5, 10, 25-28, 31-35, 37, and 38 and Exhibits L and P from the Smiley Affidavits.

## II. Relevant Facts

Fife is an individual, a citizen of Illinois who resides in Cook County, Illinois. (R.119 & R.132, Stmt. of Undisputed Facts,[3] ¶ 1.) mPhase is a New Jersey corporation with its principal place of business in Norwalk, Connecticut. (Stmt. of Undisputed Facts, ¶ 2.)[4] mPhase is a publically-held, micro-cap, technology company with approximately 23,000 shareholders. (Stmt. of Addt'l. Undisputed Facts,[5] ¶ 1.) Its stock is traded on the Pink Sheets as a public reporting company. (*Id.*) mPhase was in the product-development and pre-marketing phase for a battery during the relevant time period and had received funding by issuing convertible debt. (Stmt. of Addt'l. Undisputed Facts, ¶ 4, 6.) All stock issued by mPhase to shareholders who hold such securities in broker street names is deposited in DTC's depository arm to allow, among other things, electronic trading of the issuer's securities. (Stmt. of Addt'l. Undisputed Facts, ¶ 7.)

### A. The Securities Purchase Agreement

On September 13, 2011, mPhase, as seller, entered into a Securities Purchase Agreement with St. George,[6] as buyer. (Stmt. of Undisputed Facts, ¶ 5; R.16, ¶ 6.) Pursuant to the Securities Purchase Agreement, St George paid $500,000.00 to mPhase in exchange for a

---

[3] Citations to "Stmt. of Undisputed Facts" refer collectively to Plaintiff's Local Rule 56.1 Statement of Facts (R.119) and Defendant's Responses (R.132). For purposes of clarity, the Court will use this citation reference where the fact preceding the citation is undisputed or admitted. "In determining what is disputed, we focus not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements. When we cite as undisputed a statement of fact that a party has attempted to dispute, that reflects our determination that the evidence does not show that the fact is in genuine dispute." *Zitzka v. Vill. of Westmont*, 743 F.Supp.2d 887, 897 (N.D. Ill. 2010).

[4] The Court has jurisdiction over this dispute based on diversity of the parties and the fact that the amount in controversy exceeds $75,000.00. (*See* Stmt. of Undisputed Facts, ¶¶ 1-4.)

[5] Citations to "Stmt. of Addt'l. Undisputed Facts" refer collectively to Defendant's Local Rule 56.1 Statement of Additional Facts (R.131) and Plaintiff's Response (R.144). For purposes of clarity, the Court will use this citation reference where the fact preceding the citation is undisputed or admitted.

[6] Fife is manager of St. George Investments, LLC. (*See* R.144-1, Second Declaration of John Fife, ¶ 4.)

Convertible Note (the "Note") issued and signed by mPhase with a face amount of $557,500.00. (Stmt. of Undisputed Facts, ¶ 5; R.16, ¶ 6.)

In signing the Securities Purchase Agreement, mPhase specifically acknowledged that it (1) "agrees that the attorney that prepared this Agreement and all of the other Transaction Documents acted as legal counsel to the Buyer only" and (2) "has been, and hereby is, advised to seek legal counsel and to review this Agreement and all of the other Transaction Documents with legal counsel of his/her/its choice, and . . . either has sought such legal counsel or hereby waives the right to do so." (Stmt. of Undisputed Facts, ¶ 7.) The parties also agreed that if an action was brought "to enforce or interpret the terms of th[e Security Purchase Agreement] or any of the other Transaction Documents, the Prevailing Party . . . shall be entitled to reasonable attorneys' fees, court costs and collection costs . . . ." (Stmt. of Undisputed Facts, ¶ 8.)

### B. The Note

Fife's predecessor, St George, paid the Note in two installments. (*See* Stmt. of Undisputed Facts, ¶¶ 30, 31; *see also* R.16, ¶ 32.) The $500,000.00 purchase price for the Note reflected the face value of $557,500.00 minus an original issue discount of $50,000.00 and an additional $7,500.00 dollar reduction to cover "the Buyer's legal fees, accounting costs, due diligence, monitoring and other transaction costs incurred in connection with the purchase and sale of [securities associated with the Note.]" (Stmt. of Undisputed Facts, ¶¶ 6, 30.) Fife's predecessor, St George, funded the first Tranche of the Note in the amount of $300,000.00 (including the original issue discount and transaction expenses) on September 13, 2011. (Stmt. of Undisputed Facts, ¶ 30.) On October 14, 2011, Fife provided the second Tranche of the Note in the amount of $200,000.00. (Stmt. of Undisputed Facts, ¶ 31.) The delivery of the Second Tranche of the Note was contingent on mPhase filing a Registration Statement within 30 days of the Issuance Date of the Note. (Stmt. of Addt'l. Undisputed Facts, ¶ 19.) On October 17, 2011,

St George assigned the Note and its rights thereunder to Fife, pursuant to an Assignment of the Note (the "Assignment"). (Stmt. of Undisputed Facts, ¶ 11; R.16, ¶ 8.) mPhase approved and agreed to the Assignment. (Stmt. of Undisputed Facts, ¶ 12; R.16, ¶ 9.) mPhase filed a Registration Statement for Fife's shares that was declared effective on January 17, 2012. (Stmt. of Addt'l. Undisputed Facts, ¶¶ 26, 27.)

The Note contained terms pertaining to payment of principal on Installment Dates (*see* R.119-3, § 1), interest rates on the Outstanding Balance (*see id.*, § 2), conversion of the Note to Common Stock (*see id.*, § 3), rights upon event of default (*see id.*, § 4), and conditions surrounding payment of Installment Amounts (*see id.*, § 8). (Stmt. of Undisputed Facts, ¶ 9.) The initial interest rate on the Note, compounded daily, was 8% per annum. (Stmt. of Undisputed Facts, ¶ 32.)

Under the Note, mPhase was required to deliver a Company Installment Notice on October 27, 2011 (23 trading days prior to the Initial Installment Date). (Stmt. of Undisputed Facts, ¶ 13.) mPhase failed to deliver the Company Installment Notice on that date, and pursuant to Section 8(a) of the Note, mPhase "was deemed to have delivered on [October 27, 2011] an irrevocable Company Installment Notice." (Stmt. of Undisputed Facts, ¶ 14.) Following the deemed delivery of mPhase's Company Installment Notice, the Note required that mPhase deliver to St George and/or Fife the Pre-Installment Conversion Shares no later than October 31, 2011 (two Trading Days after October 27, 2011). (Stmt. of Undisputed Facts, ¶ 15.) mPhase did not deliver the Pre-Installment Conversion Shares on October 31, 2011, or at anytime thereafter. (Stmt. of Undisputed Facts, ¶ 16.) On April 13, 2012, Fife issued a Conversion Notice to execute a sale under the Note, in which he converted $47,541.61 of the principal amount due

under the Note into 50,422,919 shares of mPhase common stock.  (Stmt. of Addt'l. Undisputed Facts, ¶ 29.)

### C.  The Deposit Chill

In June 2011, mPhase was notified that the DTC imposed a chill on mPhase's common stock ("the Deposit Chill"), under which the DTC refused to settle any trades of mPhase's stock electronically, but instead, required the delivery of physical stock certificates to settle such trades.  (Stmt. of Undisputed Facts, ¶ 38; Stmt. of Addt'l. Undisputed Facts, ¶ 17.)  The DTC did not tell mPhase the reason for the Deposit Chill at that time.  (Stmt. of Addt'l. Undisputed Facts, ¶ 17.)  On September 17, 2012, mPhase received a letter from the Depository Trust and Clearing Corporation (the "DTCC") "in response to [mPhase's] recent inquiries to the [DTC] regarding the imposition by the DTC of a deposit transaction restriction (the 'Deposit Chill')" on stock issued by mPhase.  (Stmt. of Addt'l. Undisputed Facts, ¶¶ 32, 40.)  The letter states that "DTC has imposed the Deposit Chill, as of June 23, 2011, in order to prevent additional deposits of the Issue for depository and book-entry transfer services for the reasons set forth below."  (R.119-12, Ex. L, DTCC Letter dated Sept. 17, 2012.)  The DTCC Letter further explains that the Deposit Chill had been imposed due to:

> unusually large deposits of the Issue [mPhase stock] during the period of August 18, 2010 to the date of the Deposit Chill.  More particularly, 414, 385, 628 shares of the Issue, representing a substantial percentage of the outstanding float, where deposited at the DTC during this period.  (a list of the deposits is attached hereto as Exhibit A.)  The volume and timing of the deposits raise substantial questions as to whether those shares are tradeable without restriction under the Securities Act of 1933, as amended . . ., a prerequisite for shares being deposited into the DTC for depository and book-entry services.

(Stmt. of Undisputed Facts, ¶ 40.)  The list of deposits referred to in and attached to the DTCC Letter as Exhibit A (the "Deposits") included some deposits made by John Fife.  (Stmt. of Undisputed Facts, ¶ 41.)  On October 23, 2012, mPhase responded to the DTCC, explaining

through its outside counsel, that the Deposits and shares associated with the Deposits were "duly authorized, validly issued and fully paid and are nonassessable" and were otherwise proper transactions in compliance with applicable laws. (Stmt. of Undisputed Facts, ¶ 42; *see also id.*, ¶ 43 (October 23, 2012 letter to DTC, Martin Smiley, mPhase's in-house counsel, representing that the Deposits were proper transactions in compliance with applicable laws); *id.*, ¶ 44 (September 12, 2013 letter to DTC, stating that the Deposits and associated shares "were, at the date of deposit at the DTC, eligible under the Rules and Procedures of DTC to be deposited for the Services").) On September 16, 2013, the DTCC sent a letter to mPhase stating "that the [DTC] has determined to lift the Deposit Chill and has resumed accepting deposits of [mPhase's stock] for depository and book-entry transfer services." (Stmt. of Undisputed Facts, ¶ 45.) The DTCC representative for purposes of this lawsuit, Susan DeSantis, testified that the Deposit Chill was lifted because mPhase demonstrated that the Deposits in question were proper transactions in compliance with applicable laws. (Stmt. of Undisputed Facts, ¶¶ 46-47.)

### D.  The Standstill Agreement

On May 31, 2012, during the imposed Deposit Chill, mPhase and Fife entered into a Standstill and Restructuring Agreement (the "Standstill Agreement"). (Stmt. of Undisputed Facts, ¶ 17.) Under the terms of the Standstill Agreement, Fife agreed not to convert any portion of the Outstanding Balance of the Note into common stock for a specific period of time. (Stmt. of Undisputed Facts, ¶ 18.) In exchange, mPhase increased the Outstanding Balance of the Note by $57,612.52 (the "Standstill Fee"), and promised to begin making monthly payments to Fife beginning on October 1, 2012. (Stmt. of Undisputed Facts, ¶ 19; *see also* R.119-6, at 10 (Loan Amoritization Schedule showing monthly payment dates).) If mPhase failed to perform under the Standstill Agreement, mPhase acknowledged and agreed that "the Standstill shall terminate immediately . . . and that upon such breach of any material term or provision in this Agreement,

Lender [Fife] may seek all recourse and remedies available to it under the terms of the Note, the other Loan documents, or applicable law." (Stmt. of Undisputed Facts, ¶ 20.) The Standstill Agreement stated that mPhase "is unconditionally obligated to pay the Outstanding Balance of the Note pursuant to its terms," and that "[t]he Outstanding Balance of the Note upon execution of this Agreement, . . . shall be deemed and affirmed to be $777,769.08." (Stmt. of Undisputed Facts, ¶ 21.) The Standstill Agreement also contained a waiver provision, stating:

> [mPhase] has no defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against [Fife], directly or indirectly, arising out of, based upon, or in any manner connected with, the transactions contemplated hereby, whether known or unknown, which occurred, existed, was taken, permitted, or begun prior to the execution of this Agreement and occurred, existed, was taken, permitted, or begun in accordance with, pursuant to, or by virtue of any of the terms or conditions of the Loan Documents. To the extent any such defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action exist or existed, such defenses, rights, claims, counterclaims, actions and causes of action are hereby waived, discharged and released.

(Stmt. of Undisputed Facts, ¶ 22; R119-6, § 8(e).) In addition, Fife did not waive any prior claims for breach of the Note by entering into the Standstill Agreement. (Stmt. of Undisputed Facts, ¶¶ 22-23.) Further, mPhase acknowledged its free and voluntary entry into the Agreement and that the Agreement was "negotiated, prepared, and executed without fraud, duress, undue influence, or coercion of any kind or nature whatsoever having been exerted by or imposed upon any party by any other party." (Stmt. of Undisputed Facts, ¶ 23; R.119-6, § 8(f).) As with the Securities Purchase Agreement, the Standstill Agreement contained a provision that the prevailing party is entitled to those attorneys' fees and costs associated with any litigation or dispute arising out of the agreement. (Stmt. of Undisputed Facts, ¶ 24.) Since entering into the Standstill Agreement, mPhase has not made any payments to Fife. (Stmt. of Undisputed Facts, ¶ 25.)

### E.   The Litigation

On October 24, 2012, Fife delivered to mPhase a Conversion Notice whereby Fife elected to convert a portion of the Note's balance into 62,500,000 shares of mPhase's common stock (the "Conversion Shares")  (Stmt. of Undisputed Facts, ¶ 26.)  To date, mPhase has not delivered the Conversion Shares to Fife.  (Stmt. of Undisputed Facts, ¶ 27.)  On November 16, 2012, Fife sent mPhase an event of default redemption notice (the "Redemption Notice") electing to redeem the full Outstanding Balance and demanding immediate payment by November 23, 2012.  (Stmt. of Undisputed Facts, ¶ 28.)  mPhase did not, and has not, made payments to Fife pursuant to either the Redemption Notice or the Standstill Agreement.  (Stmt. of Undisputed Facts, ¶ 29.)

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the admissible evidence shows that no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).  "A 'material fact' is one identified by the substantive law as affecting the outcome of the suit."  *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  "A 'genuine issue' exists with respect to any such material fact, and summary judgment is therefore inappropriate, when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Conversely, "where the factual record taken as a whole could *not* lead a rational trier of fact to find the nonmoving party, there is nothing for a jury to do."  *Bunn*, 753 F.3d at 682 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)).

In determining whether a genuine issue of material fact exists, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to

the nonmoving party. *See Bunn*, 753 F.3d at 682 (citing *Anderson*, 477 U.S. at 255); *see also Kvapil v. Chippewa County, Wis.*, 752 F.3d 708, 712 (7th Cir. 2014). However, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 248 (emphasis in original). In reviewing evidence opposing a motion for summary judgment, courts are not obliged to entertain a "metaphysical doubt." *Matsushita*, 475 U.S. at 586. The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). With these standards in mind, the court addresses Fife's motion.

## ANALYSIS

### I. Fife's Breach of Contract Claim

The parties do not dispute that Illinois law governs Fife's breach of contract claim. (*See* R.118, at 3; R.130, at 15, 18.) "To prevail on a breach of contract claim, a plaintiff must establish the existence of a valid and enforceable contract, plaintiff's performance, defendant's breach of the terms of the contract, and damages resulting from the breach." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014) (citing *Lindy Lu LLC v. Ill. Cent. R.R. Co.*, 984 N.E.2d 1171, 1175 (Ill. App. Ct. 2013)). Thus, to survive summary judgment, Fife must have pointed to sufficient evidence supporting each of these elements. *See Spitz*, 759 F.3d at 730 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (nonmoving party must make a sufficient showing on all essential elements of the case on which it has the burden of proof)).

Fife's breach of contract claim alleges that mPhase breached its contractual obligations by failing to deliver shares and make payments as required by both the Note and the Standstill Agreement.  (*See* R.118, at 3; *see also* R.1, ¶ 26.)  Fife further claims that he has suffered damages as a result of the breach.  (*See* R.118, at 3-4.)

### A.      Existence of a Contractual Relationship

A contract is valid and enforceable if: (1) there is a valid offer and acceptance; (2) the terms of the contract are definite and certain; and (3) there is consideration.  *Zirp–Burnham, LLC v. E. Terrell Assocs., Inc.*, 826 N.E.2d 430, 439 (Ill. App. Ct. 2005).  The parties agree that on September 13, 2011, they entered into the Securities Purchase Agreement and the Note and that on May 31, 2012, they entered into the Standstill Agreement.  Fife attached the Securities Purchase Agreement, the Note, and the Standstill Agreement as exhibits to his Motion for Summary Judgment, and each document includes the terms of the agreements and the obligations of the parties.  (*See* R.119-2 (Securities Purchase Agreement); R.119-3 (Note); R.119-6 (Standstill Agreement).)

In consideration of the acquisition of the Note and the related Securities Purchase Agreement, St George and Fife paid $500,000.00 to mPhase, calculated from the face value of the Note ($557,500.00) less an original issue discount of $50,000.00 and less an additional $7,500.00 to cover other transactional and legal fees.  Fife also provided consideration for the Standstill Agreement in his promise not to convert any portion of the Outstanding Balance of the Note into common stock for a specific period of time (the "Standstill Period"), an action that he had a legal right to do under the Securities Purchase Agreement and Note at the time he entered into the Standstill Agreement.  In exchange, mPhase increased the Outstanding Balance of the Note by $57,612.52 (the "Standstill Fee"), and promised to begin making monthly payments to

Fife beginning on October 1, 2012. (*See* Stmt. of Undisputed Facts, ¶ 19.) mPhase benefited from Fife's promise as they were no longer under an obligation to convert shares of common stock during the imposed Deposit Chill.[7] Under Illinois law, "[a]ny act or promise that benefits one party or disadvantages the other is sufficient consideration to support the formation of a contract." *Kalis v. Colgate–Palmolive Co.*, 787 N.E.2d 182, 183 (Ill. App. Ct. 2003); *see also Cincinnati Ins. Co. v. Am. Hardware Mfrs. Ass'n*, 898 N.E.2d 216, 230 (Ill. App. Ct. 2008) (citing *Kalis*, 787 N.E.2d at 182) (holding that "a promise to forego pursuit of a legal claim will be determined to be adequate consideration to support formation of a contract even if the claim is invalid, provided that it is asserted in good faith").

mPhase does not argue about the contracts' validity, but asserts they are unenforceable. For the first time, mPhase argues that the Note is statutorily unenforceable and calls upon a remedy to void the contract under Section 29(b) of the Securities Exchange Act of 1934 (the "Act"). (*See* R.130, at 10-17.) mPhase asserts that the undisputed facts show that (or at least a genuine dispute exists whether) Fife violated Rule 10b-5 promulgated under Section 10 of the Act. (*Id.* at 10.) Rule 10b-5, according to mPhase, makes it unlawful for any person to … make untrue statements, omit material facts or engage in any deceitful practice in the purchase or sale of any security. (*Id.*) mPhase asserts that the undisputed facts show[8] that Fife is a "control person" as referred to in Regulation S-K § 299.401(g), namely based on Fife's alleged ownership percentage of mPhase's common stock. (*Id.* at 12-15.) The significance of Fife being a "control

---

[7] The undisputed facts show that the DTC indicated to mPhase that it could still trade common stock during the Deposit Chill, but that trading required delivery of physical stock certificates to settle such trades (as opposed to the electronic trading allowed by DTC). (*See* Stmt. of Undisputed Facts, ¶ 38; Stmt. of Addl. Undisputed Facts, ¶ 17.)

[8] mPhase argues in the alternative that a genuine issue of material fact exists regarding whether Fife was a "control person" such that summary judgment for Fife's breach of contract claim is precluded in this case. (*See* R.130, at 14.)

person," according to mPhase, is the requirement for the registrant to disclose on its Securities Registration whether "control persons" have been the subject of any judgment, decree or finding relating to the violation of any state or federal securities law. (*Id.*; *see also* R.144, ¶ 25.) mPhase further argues that Fife's failure to disclose to mPhase his Consent Decree, the fine levied against him, and the injunction against him, was a further violation of securities laws under Regulation S-K §§ 229.401(f)(5) & (g). (R.130, at 11.) mPhase argues that this constitutes a violation of Section 10(b) of the Act and Rule 10b-5, which is a predicate violation for finding the contract void under Section 29(b). (*Id.* at 10; *id.* at n.6.) As addressed below, mPhase's arguments of security violation do not introduce genuine issues of material fact to preclude a grant of summary judgment because mPhase contractually waived its affirmative defenses and even if it had not, it would unduly prejudice Fife to consider this defense for the first time at this stage. (*See* R.114, at 3.)

**1.     mPhase Contractually Waived Its Affirmative Defenses to Fife's Breach of Contract Claim**

The undisputed facts demonstrate that mPhase explicitly waived its contract defenses in the Standstill Agreement, which provides:

> 7.   Ratification of Note. … [mPhase] acknowledges that it is unconditionally obligated to pay the Outstanding Balance of the Note pursuant to its terms (as modified by this Agreement) and represents that such obligation is not subject to any defenses, rights of offset, or counterclaims. …
> …
> 8.   Representations and Warranties of Borrower.  In order to induce [Fife] to enter into this Agreement, Borrower, for itself, and for its affiliates, successors and assigns, hereby acknowledges, represents, warrants and agrees as follows:
> …
> (e)     [mPhase] has no defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against [Fife], directly or indirectly, arising out of, based upon, or in any manner connected with, the transactions contemplated hereby, whether known or unknown, which occurred, existed, was taken, permitted, or begun prior to the execution of this Agreement and occurred,

existed, was taken, permitted or begun in accordance with, pursuant to, or by virtue of any of the terms or conditions of the Loan Documents. To the extent any such defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action exist or existed, such defenses, rights, claims, counterclaims, actions and causes of action are hereby waived, discharged and released.

(R.119-6, §§ 7, 8(e); *see also* Stmt. of Undisputed Facts, ¶¶ 21-22 (undisputed as to the provision being in the agreement).) Such waivers are legally binding and enforceable under Illinois law. *See e.g., Bank of Am., N.A. v. 108 N. State Retail LLC,* 928 N.E.2d 42, 55 (Ill. App. Ct. 2010) (ruling that "a decision by a party to contractually agree to waive all defenses is permitted under Illinois law" and upholding trial court's order striking guarantors' affirmative defenses to plaintiff's foreclosure action where guarantors contractually agreed that they "did not have any defense, set-off or counterclaim to the payment or performance of any of their obligations under the Loan Documents"); *Chemical Bank v. Paul,* 614 N.E.2d 436, 441 (Ill. App. Ct. 1993) ("[g]uaranty agreements containing waivers of all defenses … have been upheld as validly binding"); *see also Bank of America, N.A. v. Yang*, No. 12 CV 7480, 2014 WL 2208951, * 3 (N.D. Ill. May 24, 2014) (finding defendants unambiguously waived defenses to enforcement of the guarantees based on explicit waiver in the guaranty agreement); *BA Mortgage & Int'l Realty Corp. v. American National Bank and Trust Co. of Chicago*, 706 F.Supp. 1364, 1376 (N.D. Ill. 1989) ("[w]hen [waivers in a guaranty] are clear and unambiguous, Illinois courts consistently enforce them").

"Illinois courts have uniformly held that the intention of the parties controls the scope and effect of the release; such intent is determined from the language of the instrument when read in light of the circumstances surrounding the transaction." *See Clear-Vu Packaging, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*., 434 N.E.2d 365, 367-68 (Ill. App. Ct. 1982) (citing *Gladinus v. Laughlin*, 366 N.E.2d 430, 432 (Ill. App. Ct. 1977)). Under this approach, Illinois

courts will restrict the language of a general release to the thing or things intended to be released and refuse to interpret generalities so as to defeat a valid claim not then in the minds of the parties. *Gladinus*, 366 N.E.2d at 432 (citations omitted).

mPhase acknowledges that the release in the Standstill Agreement is "worded broadly." (*See* R.130, at 18.) The language of the waiver provision fully supports this characterization, as it waives "*any* defenses, rights of offset, or counterclaims" in connection with paying the Outstanding Balance of the Note and "has *no* defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against [Fife], *directly or indirectly, arising out of,* based upon, or in any manner connected with, the transactions contemplated hereby, *whether known or unknown* …" (R.119-6, § 8(e) (emphasis added).) *See Geimer v. Administaff Companies*, No. 08 C 5724, 2009 WL 780887, at * 3 (N.D. Ill. Mar. 23, 2009) (finding plaintiff's identity theft claims, both known and unknown, waived by a release agreement broadly referring to "any claims … and any liability arising out of your employment with and separation from [defendant]") Accordingly, by the plain and unambiguous terms of the Standstill Agreement, mPhase waived the right to assert its affirmative defense of alleged security violations against Fife arising out of the Standstill Agreement.

### 2. mPhase's Affirmative Defense is Untimely and Would Prejudice Fife

In addition, mPhase did not raise a Section 29(b) defense in its pleadings as an affirmative defense or counterclaim, or address it prior to its opposition for summary judgment. Indeed, the Court has already denied mPhase's motion for leave to amend its answer and counterclaims to plead an alleged violation of securities law, namely Section 10(b) of the Act and Rule 10b-5. (R.114.) mPhase's reliance on the remedy afforded under Section 29(b) is

untimely and improper for the same reasons mPhase's prior attempt to amend its pleadings was improper.

First, mPhase's Rule 56.1 Statement of Additional Facts improperly asserts new facts in support of its new theory in an attempt to create a genuine issue of material fact precluding summary judgment. The Court, however, has already stricken the facts upon which mPhase relies for its new theory due to their noncompliance with Local Rule 56.1. (*See supra*, Legal Standard, II.) Even if the facts were admissible, however, mPhase cannot attempt to create a genuine issue of material fact by asserting new facts in its Rule 56.1 Statement of Additional Facts that support its new and untimely defense. *See Anderson v. Donahoe,* 669 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment" (internal quotation marks and citation omitted)); *see also Bell v. Bimbo Foods Bakeries Distribution, Inc.*, No. 11 C 03343, 2013 WL 6253450, at *5-6 (N.D. Ill. Dec. 3, 2013) (refusing to consider plaintiff's breach of contract theories raised in opposition to summary judgment when the court had previously denied plaintiff's leave to amend its complaint to include the same issues); *cf. Whitaker v. Milwaukee Cnty.*, __ F.3d __, 2014 WL 6657076, at *5 (7th Cir. Nov. 25, 2014) (finding an alternative legal characterization, as opposed to adding a new substantive claim or a new factual theory of liability, permissible where the complaint alleged an "agency" relationship between the parties and the opposition argued a relationship of "joint employer" because the fundamental factual allegations were supported by identical facts about which there was no material dispute).

In addition, Fife would suffer prejudice if the Court permitted mPhase to assert its new facts related to its securities arguments at this stage. Fact discovery closed on December 16, 2013. (*See* R.114.) The parties would have to conduct additional fact discovery to allow Fife to

investigate mPhase's stock ownership percentage, whether and how officers of mPhase viewed Fife as a control person, Fife's actual control of mPhase, the materiality of a consent decree to investors for voting or investing, the preparation of the registration statement, the purpose of putting in the registration requirements in the agreements at issue, and a myriad of other factual scenarios that could or would have bearing on this analysis. Consideration of mPhase's new allegations of securities violations for creating genuine issues of material fact, without having allowed additional discovery would clearly and unduly prejudice Fife. *See Ramada Franchise Systems, Inc. v. Royal Vale Hospitality of Cincinnati, Inc.*, No. 02 C 1941, 2004 WL 2966948, at *5 (N.D. Ill. Nov. 24, 2004) (denying defendants' motion for leave to file an amended counterclaim for fraud because it would subject plaintiff "to undue prejudice if it needed to reopen discovery to address these issues at this late juncture"); *see also Jones v. City of Elkhart. Ind.*, 737 F.3d 1107, 1115-16 (7th Cir. 2013) ("district courts enjoy extremely broad discretion in controlling discovery").

Because mPhase's allegations of security violations were untimely and because consideration of those facts would unduly prejudice Fife, the Court, in its discretion, refrains from considering them. mPhase has, therefore, failed to raise a genuine issue of material fact that refutes the validity and enforceability of the Note and the surrounding contractual agreements.

### B.    Performance by Fife

The undisputed evidence establishes that Fife performed all of his required obligations under the Note by paying the agreed value. Specifically, Fife (by way of its predecessor St George) funded the Note by paying $500,000.00 to mPhase. (Stmt. of Undisputed Facts, ¶¶ 5, 6.) The undisputed evidence also establishes that Fife performed his required obligation

under the Standstill Agreement, to refrain from converting the Note for a promised period, provided that mPhase made monthly payments. (*See* R.119-6, § G.)

### C. Breach by mPhase

No genuine issues of material fact exist regarding mPhase's failure to act as required by the Note and Standstill Agreement. (*See supra*, Background, II.E.) Rather, mPhase only disputes whether these failures to act constitute a breach. The plain, unambiguous, and explicit language of the agreements makes clear that mPhase breached its contractual obligations under the Note and Standstill Agreement.

### 1. Breach of the Note

The parties agree that mPhase failed to deliver written notice ("Company Installment Notice") on October 27, 2011 and further failed to deliver to St George and/or Fife the Pre-Installment Conversion Shares (due no later than October 31, 2011). (*See* Stmt. of Undisputed Facts, ¶¶ 13-16.) mPhase attempts to create a genuine issue by raising facts regarding, not the timing for the Company Installment Notice, but the timing for the Initial Installment Date. In particular, mPhase argues that Section 8(a) of the Note provides that the Initial Installment Date was the earlier of November 30, 2011 or the effective date of the Registration Statement. (*See* R.132, ¶¶ 13-16.) mPhase's assertions, however, miss the mark as evidenced by the plain and unambiguous language of the Note. *See Bordelon v. Chicago School Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (explaining that the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted").

First, the Initial Installment Date is not referenced in Section 8(a), but rather in Section 8—Section 8(a) references the Company Installment Notice and Installment Notice Due Date.

Second, the Initial Installment Date and the Company Installment Notice are two separate, albeit related, concepts contemplated by the Note. The Company Installment Notice is the written notice that mPhase was obligated to deliver to Fife on the Installment Notice Due Date (i.e., twenty-three (23) Trading Days prior to each Installment Date). (*See* R.119-3, § 8(a).) mPhase correctly notes that the Initial Installment Date is the earlier of November 30, 2011 or the effective date of the Registration Statement. The October 27, 2011 due date for the Company Installment Notice presumes an Initial Installment Date of November 30, 2011 and calculates the date for sending the Company Installment Notice related to that Initial Installment Date as twenty-three Trading Days prior. (*See* R.119-5, Saxton Aff., ¶ 8.)

mPhase's failure to deliver the Company Installment Notice on October 27, 2011, triggered the second half of Section 8(a) of the Note which dictates that mPhase "shall be deemed to have delivered on the Installment Notice Due Date an irrevocable Company Installment Notice" confirming conversion of the entire Installment Amount. (*See* R.119-3, § 8(a); R.119-5, ¶¶ 9-10.) The Note further dictates that "[n]o later than two (2) Trading Days after delivery or deemed delivery (as applicable) of the applicable Company Installment Notice," "[mPhase] shall deliver to [Fife's] account via DTC the Pre-Installment Conversion Shares." (R.119-3, § 8(a); R.119-5, ¶ 11.) mPhase failed to deliver the Pre-Installment Conversion Shares on October 31, 2011 or at any time thereafter. (*See* Stmt. of Undisputed Facts, ¶ 16.) No genuine issues of fact exist to dispute this fact.

### 2. Breach of the Standstill Agreement

Following mPhase's breach of the Note, mPhase and Fife entered into the Standstill Agreement which included a "Ratification of the Note" provision wherein the Note "remain[ed] in full force and effect (subject to the amendments set forth herein) in accordance with its terms."

(R.119-6, § 7.)  The Standstill Agreement also required mPhase to make monthly payments to Fife, "(each, a "Note Payment"), which Note payments shall be made in the form of cash." (R.119-6, § 4.)  It is undisputed that mPhase failed to make its first payment due under the Standstill Agreement.  (*See* Stmt. of Undisputed Facts, ¶ 25.)  The Standstill Agreement specifically contemplated the consequence of mPhase's breach and acknowledged that "the Standstill shall terminate immediately … and that upon such breach of any material term or provision in this Agreement, [Fife] may seek all recourse and remedies available to it under the terms of the Note, the other Loan documents, or applicable law."  (R.119-6, § 6; *see also id.* § 2.)

The Note addressed an Event of Default as defined in Section 4, which states:

(a)  Event of Default.  Each of the following events shall constitute an "**Event of Default**":

> …
> (iv) [mPhase's] failure to pay to [Fife] any amount of Principal, Interest, Late Charges or other amounts when and as due (including, without limitation, a failure to deliver Post-Installment Conversion Shares or Pre-Installment Conversion Shares) under this Note (including, without limitation, [mPhase's] failure to deliver any Installment Amount when due or to pay any redemption payments or amounts hereunder) or any other Transaction Documents (as defined in the Purchase Agreement) or any other agreement, document, certificate or other instrument delivered in connection with the transactions contemplated hereby …
> …
> (b) Notice of an Event of Default; Redemption Right.  Upon the occurrence of an Event of Default, [mPhase] shall within one (1) Business Day deliver written notice thereof via facsimile and overnight courier (with next day delivery specified) (an "**Event of Default Notice**") to [Fife].  At any time after the earlier of [Fife's] receipt of an Event of Default Notice and [Fife] becoming aware of an Event of Default, [Fife] may require [mPhase] to redeem (regardless of whether such Event of Default has been cured) all or any portion of this Note by delivering written notice thereof (the "**Event of Default Redemption Notice**") to [mPhase], which Event of Default Redemption Notice shall indicate the portion of this Note [Fife] is electing to redeem. …

(R.119-3, § 4(a)(iv) (emphasis in original); *id.*, § 4(b) (emphasis in original); *see also* Stmt. of Undisputed Facts, ¶ 9.)  Because mPhase did not make a Note Payment, Fife sent

mPhase the "Redemption Notice" electing to redeem the full Outstanding Balance and demanding immediate payment by November 23, 2012. (*See* Stmt. of Undisputed Facts, ¶ 28.) mPhase did not, and has not, made payments to Fife pursuant to the Redemption Notice. (*See* Stmt. of Undisputed Facts, ¶ 29.)

### 3. mPhase's Obligations to Perform Are Not Excused

Although the facts—even when viewed in the light most favorable to mPhase—establish that mPhase breached its contractual obligations, mPhase contends that Fife cannot recover for mPhase's breach of contract because he was partially responsible for mPhase's inability to perform. (*See* R.130, at 15-17.) Under Illinois contract law, "when a party prevents performance of a contract, that party cannot recover for non-performance by the other party." *Knowles v. Westbrook Builders, Ltd.*, 544 N.E.2d 121, 123 (Ill. App. Ct. 1989); *see also Barrows v. Maco, Inc.*, 419 N.E.2d 634, 639 (Ill. App. Ct. 1981) (citations omitted) ("Delays and nonperformance while they amount to a failure to perform are excused where performance is prevented by the other party to the contract"). In addition, impossibility of performance is a valid affirmative defense in an action for breach of contract. *See, e.g., Radkiewicz v. Radkiewicz*, 818 N.E.2d 411, 418 (Ill. App. Ct. 2004); *Illinois-American Water Co. v. City of Peoria*, 774 N.E.2d 383, 392 (Ill. App. Ct. 2002).

No genuine issues of material fact exist that preclude the Court from finding that Fife did not prevent mPhase's performance. Indeed, the crux of mPhase's argument relies on its alleged inability to convert the Note to common stock because of the Deposit Chill. mPhase's breach of the Standstill Agreement, however, did not require issuance of shares, but required a payment in cash (the "Note Payment")—not stock— to Fife on the first Installment Date. (*See* R.119-6, § 4.) mPhase also argues that it was Fife's Consent Decree that caused the Deposit Chill to be

imposed.  Viewing the evidence in the light most favorable to mPhase, however, no genuine

issue of material fact exists regarding whether Fife's Consent Decree caused the Deposit Chill.

Rather, the undisputed facts establish the Deposit Chill was imposed for a group of large

transactions made by mPhase, including, but not limited to, conversion of shares owed to Fife.

mPhase relies on deposition testimony from the DTCC representative, Susan DeSantis, for the

existence of a genuine issue of material fact, namely that the Consent Decree caused the Deposit

Chill.  (*See* R.132, ¶¶ 27, 46, 48.)  Ms. Desantis's testimony, however, does not establish that the

DTCC was even aware of Fife's Consent Decree, let alone the fact that it was considered when

imposing the Deposit Chill.  (*See* R.132-2, at 1-15.)  As the Court noted previously, "the DTCC

representative who testified on this case did not remember the details of the DTC[C] chill or

exactly what caused it."  (*See* R.116, at 6.)

　　　　In addition, mPhase sent a letter to the DTC on October 23, 2012, requesting the lift of

the Deposit Chill and referenced "certain specified deposits of shares of the Company's

Common Stock which, purportedly due to their timing and volume, gave rise to the Deposit

Chill."  (R.119-13, at DTC011.)  On September 16, 2013, the DTCC sent a letter to mPhase

stating that "the [DTC] has determined to lift the Deposit Chill and has resumed accepting

deposits of [mPhase's stock] for depository and book-entry transfer services."  (*See* Stmt. of

Undisputed Facts, ¶ 45.)  Ms. DeSantis testified that the DTCC lifted the Deposit Chill because

mPhase demonstrated that the Deposits in question were proper transactions in compliance with

applicable laws.  (*See* Stmt. of Undisputed Facts, ¶ 47.)  The undisputed facts, therefore, indicate

the Deposit Chill was imposed for the reasons as stated in the DTCC Letter, which does not refer

to Fife's Consent Decree.  mPhase's reliance on additional evidence does not create a genuine

issue of material fact that anything outside this reasoning was responsible for imposition of the Deposit Chill.

Finally, mPhase has not established a genuine issue of fact under the doctrine of impossibility. The doctrine of impossibility of performance "will be applied if there is an unanticipated circumstance that has made the performance of a contract vitally different from what should reasonably have been within the contemplation of the parties when the contract was entered." *Illinois-American Water*, 774 N.E.2d at 392. The doctrine "requires that the circumstances creating the impossibility were not and could not have been anticipated by the parties, that the party asserting the doctrine did not contribute to the circumstances, and that the party demonstrate that it has tried all practical alternatives available to permit performance." *Id.* (citations omitted). In other words, in order to avoid breach of contract on grounds of impossibility, mPhase must show: (1) an unanticipated circumstance; (2) that was not foreseeable; (3) to which mPhase did not contribute; and (4) that mPhase has tried all practical alternatives. *See id.* No genuine issues of material fact exist that demonstrate impossibility. Rather, the undisputed facts show that mPhase contributed to the situation at hand and further, that mPhase did not try all practical alternatives.

Fife alleges that mPhase breached the Standstill Agreement by not making the first required payment. (*See* R.143, at 23.) mPhase acknowledges that it did not make a payment to Fife under the Standstill Agreement. According to mPhase, it could not perform under the Standstill Agreement because it did not want to convert and issue more shares to Fife while the Deposit Chill was in place. As previously discussed, however, the Standstill Agreement, specifically contemplated mPhase's payment in cash to Fife, not payment in stock. Indeed, the Standstill Agreement was an agreement that Fife would not seek to convert any of the debt into

common stock provided that mPhase made its payments to Fife.  mPhase's failure to pay Fife

under the Standstill Agreement places mPhase in the self-inflicted position of having to honor a

conversion request and convert into common stock what otherwise would have been a cash

payment to Fife.  As such, mPhase cannot assert impossibility, when its own actions contributed

to the situation.  *See Illinois-American Water*, 774 N.E.2d at 392.

mPhase also did not try all practical alternatives as the undisputed facts show that the

DTC indicated to mPhase that it could still trade common stock during the Deposit Chill, but that

trading required delivery of physical stock certificates to settle such trades (as opposed to the

electronic trading allowed by DTC).  (*See* Stmt. of Undisputed Facts, ¶ 38; Stmt. of Addl.

Undisputed Facts, ¶ 17.)  As such, mPhase was not prevented from converting stock during the

Deposit Chill, but it was prevented from electronically trading the stock.  No genuine issues of

fact exist to dispute this fact.

### D.     Damages

Fife contends that the damages owed on the Note as of June 26, 2014 total $1,134,940.15,

which includes the principal, interest, and the Standstill Fee.  (*See* R.132, ¶ 36.)  The parties do

not dispute that the initial interest rate, compounding daily, was 8% per annum.  (Stmt. of

Undisputed Facts, ¶ 32.)  The Standstill Agreement stated that mPhase "is unconditionally

obligated to pay the Outstanding Balance of the Note pursuant to its terms," and that "[t]he

Outstanding Balance of the Note upon execution of this Agreement, . . . shall be deemed and

affirmed to be $777,769.08."  (Stmt. of Undisputed Facts, ¶ 21.)

mPhase argues that the following disputed issues of fact exist regarding Fife's damages

calculations: (1) the assumption that the Standstill Fee was due on the execution date of the

Standstill Agreement (May 31, 2011), (2) the assumption that the annual interest rate on the Note

was anything other than 8%, and (3) the inclusion of a $125,000 charge when Fife demanded conversion of the Note. (*See* R.130, at 17.) The Court addresses each argument in turn.

### 1. No Genuine Issues of Material Fact Exist Regarding Inclusion of the Standstill Fee in the Damages Calculations

The Standstill Agreement provided for a Standstill Fee (referred to in the Standstill Agreement as the "Standstill Effect") "as a material inducement and partial consideration for [Fife's] agreement to enter into this Agreement, … The Standstill Effect shall be fully earned and nonrefundable upon the execution and delivery of this Agreement by the parties." (R.119-6, § 3.) The provision of the Standstill Agreement which ratified the Note, provided that "the Outstanding Balance of the Note upon execution of this Agreement, including the Standstill Effect, shall be deemed and affirmed to be $777,769.08." (*Id.*, § 7.) Fife uses this agreed amount as a starting point in its damages calculation. (*See* R.119, ¶ 34.) mPhase argues that it "understood that [the Standstill Fee] was to be earned only if Plaintiff refrained from converting and/or selling Defendant's stock until October 1, 2012." (*See* R.130, at 17.) Under Illinois contract law, "if the language of a contract is clear and unambiguous, the intent of the parties must be determined solely from the language of the contract itself." *Palm v. 2800 Lake Shore Drive Condo. Ass'n*, 10 N.E.3d 307, 328 (Ill. App. Ct. 2014) (citing *Virginia Surety Co. v. Northern Ins. Co. of New York*, 866 N.E.2d 149, 153 (2007) ("[t]he cardinal rule is to give effect to the parties' intent, which is to be discerned from the contract language")); *see also Premier Title Co. v. Donahue*, 765 N.E.2d 513, 516 (Ill. App. Ct. 2002). Courts give the language its plain and ordinary meaning and enforce the contract as written. *See Virginia Surety*, 866 N.E.2d at 153.

Here, the plain and unambiguous language of the contract indicates that the Standstill Fee was earned when the parties entered into the agreement. mPhase points to no language in the

Standstill Agreement, and the Court finds nothing, to explain mPhase's argument that the Standstill Fee was to be earned only if Fife did not convert or sell until October 1, 2012. As such, no genuine issues of material fact exist precluding the finding that the Standstill Fee is properly included as of the execution date of the Standstill Agreement (May 31, 2012).

###  2. No Genuine Issues of Material Fact Exist Regarding Inclusion of the 18% Interest Rate Due to mPhase's Breach

mPhase disagrees that an increased interest rate of 18% was triggered on October 31, 2011 by mPhase's failure to make timely payment or to provide the required shares. (R. 132, ¶ 33.) The Court has already found that mPhase breached its contractual obligations under the Note and the related agreements. (*See supra,* Analysis, I.C.) Therefore, the unambiguous terms of the Note dictate the applicable interest rate. *See Kallman v. Radioshack Corp.*, 315 F.3d 731, 735 (7th Cir. 2002) (citations omitted) (explaining that "interpretation of the terms of an unambiguous contract is traditionally a question of law and is particularly suited to disposition on summary judgment.") Section 2 of the Note, referenced by Fife, states: "[i]nterest on the Outstanding Balance of this Note shall accrue at the rate of eight percent (8%) per annum, provided upon the occurrence and during the continuance of an Event of Default, Interest shall accrue on the Outstanding Balance at the rate of eighteen percent (18%) per annum." (*See* R.119-3, § 2; R.119, ¶ 33.) As addressed above, no genuine issues of material fact exist to preclude a finding that mPhase failed to deliver the Company Installment Notice on October 27, 2011 and failed to deliver the Pre-Installment Conversion Shares to Fife's account. These failures constitute an Event of Default under the plain language of the Note. (*See* R.119-3, § 4(a)(iv) (emphasis in original); *id.*, § 4(b) (emphasis in original); *see also* Stmt. of Undisputed Facts, ¶ 9.) As such, the undisputed facts establish that an Event of Default occurred and the

Interest on the Outstanding Balance as of October 30, 2011 accrued at the rate of 18% per annum.

### 3. No Genuine Issues of Material Fact Exist Regarding an Alleged $125,000 Charge

Without pointing to any documents or portions of the contractual agreements entered into between the parties, mPhase argues that Fife has included a $125,000 charge in his damages calculation that should have only been due if mPhase paid the balance in cash, rather than stock. (*See* R.130, at 17.) The Smiley Affidavit upon which mPhase relies in support of this position argues that Fife is not entitled to the $125,000 fee, but provides no reference to where Fife included this fee in his damages calculation. (*See* R.131-1, Exhibit A, ¶ 39.) The Saxton Affidavit, upon which Fife relies to establish damages, and Saxton's corresponding summary of damages spreadsheet referenced in her affidavit, are silent as to an additional $125,000 charge. (*See* R.119-5; R.119-11.) The Court, therefore, has not been provided with any context for evaluating this undeveloped argument. Even if there was an extra charge, however, the parties explicitly agreed to an Outstanding Balance, as of May 31, 2012, of $777,769.08 and this amount was used by Fife in its damages calculations.

## II. mPhase's Counterclaim for Fraud

Fife also moves for the Court to grant summary judgment in its favor regarding mPhase's counterclaims for breach of contract and fraud. In its responsive brief, mPhase conceded that the Court could dismiss its breach of contract claim.[9] (*See* R.130, at 2.) Accordingly, the Court addresses only the counterclaim for fraud and grants summary judgment in Fife's favor as to mPhase's breach of contract counterclaim.

---

[9] mPhase's breach of contract claim also raised an allegation of breach of good faith and fair dealing, which upon mPhase's concession to dismissal of the breach of contract claim is also hereby dismissed. (*See* R.16, ¶¶ 8-11.)

## A.    mPhase Waived its Counterclaim for Fraud

As discussed above, mPhase's broad language resulted in waiver of its affirmative defenses and counterclaims related to the contractual agreements at issue.  (*See supra*, Analysis, I.A.1.)  mPhase argues that it could not have waived its fraud claim because "[a]t the time of the Standstill Agreement, mPhase had no knowledge of the Consent Decree/Judgment."  (R.130, at 18; *see* R.119-8, Smiley Deposition, 5:12-6:7; *id.*, 49:1-51:21 (establishing that mPhase was not aware of the Consent Decree until at least late October of 2012).)

The waiver provision of the Standstill Agreement, however, explicitly includes "defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against [Fife], … whether known or unknown, …".  (Stmt. of Undisputed Facts, ¶ 22; R119-6, §8(e)).  Neither party argues that the language of the Standstill Agreement is ambiguous.  The waiver provision, therefore, on its face releases Fife from mPhase's affirmative defenses and counterclaims, both known and unknown.  (*See* R.119-6, § 8(e)); *see RBS Citizens, Nat'l Ass'n v. RTG-Oak Lawn, LLC*, 943 N.E.2d 198, 203-04 (Ill. App. Ct. 2011) (finding a waiver of defenses applicable to various affirmative defenses and counterclaims, including breach of contract and fraud); *Maguire v. Misomex North American, Inc.*, No. 97 C 2095, 1998 WL 355528, at * 3 (N.D. Ill. 1998) (relying on the absence of any language in a release that covered claims that were "unknown" to find material issues of fact precluding summary judgment on claims that were unknown to plaintiff when he signed his release).

In addition, under Illinois law, "a general release is valid as to all claims of which a signing party has actual knowledge or that he could have discovered upon reasonable inquiry." *See Geimer*, 2009 WL 780887, at * 3 (*citing Oberweis Dairy, Inc. v. Assoc. Milk Producers, Inc.*, 568 F.Supp. 1096, 1101 (N.D. Ill. 1983)).  mPhase has not provided facts, however, to

establish that a reasonable inquiry would not have resulted in discovery of Fife's Consent

Decree, nor has it provided facts to establish a genuine issue regarding whether Fife concealed

the Consent Decree from mPhase. The "signing of a waiver provision should not be taken

lightly, with the expectation that the waiver will be unenforceable even as to existing claims

because the party executing the waiver kept his eyes closed, and therefore did not 'know'".

*Goodman v. Epstein*, 582 F.2d 388, 403-04 (7th Cir. 1978). In *Goodman v. Epstein*, the Seventh

Circuit affirmed a district court's determination that addressed securities fraud claims may be

released—even absent actual knowledge—if the party could have known of the claims at the

time it signed the agreement. *Id.* In this case, mPhase Fife's Consent Decree was a public

document, a judgment entered against Fife in the Northern District of Illinois in 2007. *See Bond*

*v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009) ("Documents filed in court are presumptively

open to the public"); *Madyun v. Linjer*, No. 08-cv-32-bbc, 2008 WL 4144484, at *1 (Aug. 29,

2008) (referring to federal court decisions as "matters of public record and available on the

federal judiciary's PACER system."). As such, it could have been located upon reasonable

inquiry. *See Chicago Title & Trust Co. v. Vill. of Mount Prospect*, 513 N.E.2d 915, 917 (Ill.

App. Ct. 1987) (finding consent decrees permitting development of the property at issue could

have been located upon reasonable inquiry because they were a matter of public record).

 Because mPhase also could have discovered Fife's Consent Decree upon reasonable

inquiry, its counterclaim of fraud was contemplated by the broad scope of the waiver provision

in the Standstill Agreement and is therefore waived. *See Geimer*, 2009 WL 780887, at * 3

(finding plaintiff's identity theft claims, both known and unknown, waived by a release

agreement broadly referring to "any claims … and any liability arising out of your employment

with and separation from [defendant]")

### B. mPhase Cannot Establish Genuine Issues of Material Fact Relating to Its Counterclaim of Fraud

Even if mPhase did not waive its counterclaim of fraud, mPhase has failed to establish genuine issues of material fact relating to its fraud claim, and the undisputed facts demonstrate its fraud claim fails as a matter of law. mPhase alleged a counterclaim of fraud in the inducement and fraud based on Fife's alleged concealment of his Consent Decree, which allegedly caused the Deposit Chill, which resulted in mPhase's alleged inability to issue common stock via DTC.

In order for a misrepresentation to constitute fraud which invalidates a contract, "[1] it must be a representation in the form of a statement of a material fact, [2] made for the purpose of inducing a party to act; [3] it must be false and known by the party making it to be false, or not actually believed by him, on reasonable grounds, to be true; and [4] the party to whom it is made must be ignorant of its falsity, must reasonably believe it to be true, must act thereon to his damage, and in so acting must rely on the truth of the statement." *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 864 N.E.2d 927, 939 (Ill. App. Ct. 2007) (citing *Wilkinson v. Appleton*, 190 N.E.2d 727, 729-30 (Ill. 1963); *see also Weidner v. Karlin*, 932 N.E.2d 602, 605 (Ill. App. Ct. 2010); *RBS Citizens*, 943 N.E.2d at 208. Allegations of material omissions carry an additional burden to show that the "omission or concealment of a material fact" was "accompanied by the intent to deceive under circumstances which create the opportunity and duty to speak."[10] *Warren Chevrolet, Inc. v. Bemis*, 555 N.E.2d 101, 103 (Ill. App. Ct. 1990); *see also Weidner*, 932 N.E.2d at 605. "There is no duty to speak absent a fiduciary or other legal

---

[10] The requirement of "duty to speak" also exists within a claim for fraud in the inducement relying on omission or concealment of a material fact. *See Janowiak v. Tiesi*, 932 N.E.2d 569, 579 (Ill. App. Ct. 2010) (explaining that omission or concealment of a material fact in a fraud in the inducement claim must be made "under circumstances creating an opportunity and duty to speak").

relationship between the parties." *Neptuno Treuhand-Und Vewaltungsgellschaft mbh v. Arbor*, 692 N.E.2d 812, 817 (Ill. App. Ct. 1998).

mPhase relies on Fife's alleged status as a "control person" to provide genuine issues of material fact relating to his affirmative duty to speak. (*See* R.130, at 18-19.) As previously addressed, however, mPhase cannot pursue its securities arguments at this stage in an effort to establish genuine issues of material fact. (*See supra*, Analysis, I.A.2.) The undisputed facts establish an arms-length business relationship between Fife and mPhase, but do not establish a fiduciary or special relationship. (*See* Stmt. of Undisputed Facts, ¶ 23; R.119-6, § 8(f)); *see also Seaboard Seed Co. v. Bemis Co., Inc.*, 632 F.Supp. 1133, 1136 (N.D. Ill. 1986) (citing *Carey Electric Contracting, Inc. v. First Nat'l Bank of Elgin*, 392 N.E.2d 759, 763-64 (Ill. App. Ct. 1979)) (explaining that Illinois law "makes clear most business relationships do not of themselves create fiduciary obligations"); *Carey Electric*, 392 N.E.2d at 763 ("Normal trust between friends or businesses, plus a slightly dominant position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship").

The lack of Fife's duty to speak is especially true here, where the Standstill Agreement explicitly acknowledged the active participation of both parties as sophisticated businesses. The Standstill Agreement states:

> [mPhase] further acknowledges and agrees that it has actively and with full understanding participated in the negotiation of this Agreement and all other documents executed and delivered in connection with this Agreement after consultation and review with its counsel (or had the opportunity to be represented by counsel), that all of the terms and conditions of this Agreement and the other documents executed and delivered in connection with this Agreement have been negotiated at arm's-length, and that this Agreement and all such other documents have been negotiated, prepared, and executed without fraud, duress, undue influence, or coercion of any kind or nature whatsoever having been exerted or imposed upon any party by any other party.

(R.119-6, § 8(f).)  In addition, mPhase presented statements of fact surrounding prior business relationships between mPhase and Fife relating to other convertible notes.  (*See* R.131, ¶¶ 12-17.)  As such, mPhase has failed to establish genuine issues of material fact surrounding Fife's alleged duty to speak and the undisputed facts demonstrate that no such duty existed here.

In addition, the undisputed facts establish that no reasonable fact finder could find evidence to support a link between Fife's Consent Decree and the imposition of the Deposit Chill.  mPhase's alleged injury caused by Fife's failure to disclose his Consent Decree stems from the imposition of the Deposit Chill by the DTC.  As discussed above, however, there is no evidence to adequately provide a dispute about the fact that the Deposit Chill was imposed for the reasons stated in the letter from the DTCC.  The DTCC Letter states that "unusually large deposits" of mPhase stock during a period starting in 2010 were responsible for the Deposit Chill.  (*See* Stmt. of Undisputed Facts, ¶ 40.)  The DTCC Letter makes no reference to Fife's Consent Decree and no documents or evidence have been submitted to support a connection between the Consent Decree and the Deposit Chill.   As such, the undisputed facts do not establish the alleged injury suffered by mPhase is due to Fife's Consent Decree.

## III.    Attorneys' Fees

In Illinois, "successful parties are generally responsible for their own attorneys' fees unless a statute or contract provides otherwise."  *Rexam Beverage*, 620 F.3d at 734 (citing *Taylor v. Pekin Ins. Co.*, 899 N.E.2d 251, 256 (Ill. App. Ct. 2008)).  Courts strictly construe contractual provisions permitting the award of attorneys' fees, but the decision to award costs and fees pursuant to such provisions lies within trial court's sound discretion.  *Reexam Beverage*, 620 F.2d at 734 (citing *Mountbatten Sur. Co. v. Szabo Contracting, Inc.*, 812 N.E.2d 90, 104 (Ill. App. Ct. 2004).

Here, it is undisputed that the Note and the Security Purchase Agreement entitle the Prevailing Party to reasonable attorneys' fees, court costs and collection costs. (*See* Stmt. of Undisputed Facts, ¶¶ 8, 24.) Fife asserts that as of May 19, 2014, he spent $205,655.93 in attorneys' fees and costs in pursuing the litigation against mPhase. (*See* R.119, ¶ 37.) mPhase admits that if Fife prevails on his claims, he is entitled to recover legal fees, but reserves the right to contest the reasonableness of Fife's legal fees and the necessity for the work performed. (*See* R.132, mPhase's Response to Fife's Statement of Facts, ¶ 37.) As such, because the Court has found that Fife prevailed on its breach of contract claim and on dismissal of mPhase's breach of contract and fraud counterclaims, and because the parties do not dispute payment of attorneys' fees to the prevailing party as relates to these claims, Fife should proceed with filing a fee motion pursuant to Federal Rule of Civil Procedure 54 and, in doing so, both parties are expected to fully comply with Local Rule 54.3.

## CONCLUSION

For the reasons stated above, the Court grants Fife's motion for summary judgment on its breach of contract claim (Count I) and dismisses without prejudice Fife's quasi contract, unjust enrichment, and/or quantum meriut claim (Count II), pled in the alternative.  In addition, the Court dismisses with prejudice mPhase's breach of contract counterclaim (Counterclaim No. 1), by agreement of the parties, and dismisses with prejudice mPhase's breach of fraud counterclaim (Counterclaim No. 2).

**DATED:  December 15, 2014**                     ENTERED

_____
AMY J. ST. EVE
United States District Court Judge